05-1423-cr; 05-1063-cr
*United States v. Amerson*

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

————

August Term, 2005

(Argued: September 26, 2005                    Decided: April 4, 2007)

Docket Nos. 05-1423-cr; 05-1063-cr

————

UNITED STATES OF AMERICA,

*Appellee*,

– v.–

KAREN H. AMERSON,

*Defendant-Appellant.*

United States of America,

*Appellee*,

– v.–

Julius Graves,

*Defendant-Appellant.*

————

Before: CALABRESI, KATZMANN, and B. D. PARKER, *Circuit Judges*.

————

1

Appellants in these consolidated cases appeal a portion of their sentences imposed by the United States District Court for the Western District on the grounds that the Justice For All Act of 2004, Pub. L. No. 108-405, 118 Stat. 2260, which requires federal offenders convicted of a felony to supply a sample of their DNA for analysis and storage in a federal database, is unconstitutional as applied to them — probationers convicted of non-violent crimes. We hold that requiring convicted felons sentenced to probation to submit DNA samples under the Act does not violate the Fourth Amendment. Affirmed.

---

TIMOTHY W. HOOVER, Federal Public Defender's Office,
Western District of New York, Buffalo, N.Y.,
*for Defendants-Appellants Amerson and Graves.*

STEPHAN J. BACZYNSKI, Assistant United States Attorney
*for* Kathleen M. Mehltretter, Acting United States Attorney,
Western District of New York, Buffalo, N.Y., *for Appellee.*

---

CALABRESI, *Circuit Judge*:

The Justice For All Act of 2004, Pub. L. No. 108-405, 118 Stat. 2260 ("the 2004 DNA Act" or "DNA Act" or "the Act"), requires federal offenders convicted of "[a]ny felony" to supply a sample of their DNA for analysis and storage in the Combined DNA Index System ("CODIS"), a national database administered by the Federal Bureau of Investigation ("FBI") and the Bureau of Prisons. We have twice approved of similar, although more narrowly drafted, state DNA indexing statutes. *See Nicholas v. Goord*, 430 F.3d 652, 669 (2d Cir. 2005) (validating New York's DNA indexing statute); *Roe v. Marcotte*, 193 F.3d 72, 77 (2d Cir. 1999) (holding constitutional Connecticut's DNA indexing statute). In doing so we joined the unanimous results reached by our sister circuits which have considered earlier versions of the DNA Act and corresponding state statutes. *See generally Nicholas*, 430 F.3d at 658-59 (collecting cases). We revisit the issue here to

consider whether the 2004 DNA Act violates the Fourth Amendment when applied to individuals convicted of nonviolent crimes who were sentenced only to probation.[1] We conclude that it does not.

BACKGROUND

Beginning in 1994, Congress instructed the FBI to establish and maintain an index of DNA samples from convicted criminals, crime scenes, and unidentified human remains. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994). In December 2000, Congress enacted the first federal statute affirmatively directing convicted felons to submit DNA samples to the national database. Under the DNA Analysis Backlog Elimination Act of 2000 ("the 2000 DNA Act"), Pub. L. No. 106-546, 114 Stat. 2726 (2000) (codified as amended at 42 U.S.C. §14135a (2000)), individuals convicted of a "qualifying Federal offense" must provide a "tissue, fluid, or other bodily sample" for analysis. *See* 42 U.S.C. §§ 14135a(a)(1), (c)(1). After a sample is collected, unique identifying information is obtained for each felon by decoding sequences of "junk DNA," which were "purposely selected because they are not associated with any known physical or medical characteristics." H.R. Rep. No. 106-900(I) (2000), 2000 WL 1420163, at * 27. The DNA profiles are then loaded into CODIS, a national database that also contains profiles generated by state DNA collection programs, as well as DNA samples obtained from the scenes of unsolved crimes. *See* 42 U.S.C. §§ 14132(a)-(b). A convicted felon's failure to cooperate constitutes

---

[1] The Courts of Appeals that have considered the 2004 DNA Act have held that it also does not violate the Fourth Amendment. *United States v. Hook*, 471 F.3d 766 (7th Cir. 2006); *United States v. Conley,* 453 F.3d 674 (6th Cir. 2006); *United States v. Hand*, 189 Fed. Appx. 896 (11th Cir. July 13, 2006) (upholding federal DNA law on the basis of Eleventh Circuit's prior holding approving of Georgia's DNA statute); *United States v. Rodriguez-Benavides*, 148 Fed. Appx. 813 (11th Cir. Aug. 30, 2005) (same). We have found two reported district court decisions concerning the 2004 DNA Act. A district court in Oklahoma approved the modified Act, *Banks v. Gonzales*, 415 F. Supp. 2d 1248 (N.D. Okla. 2006), while a district court in Massachusetts ruled that the Act was unconstitutional as applied to a probationer, *United States v. Stewart*, 468 F. Supp. 2d 261 (D. Mass. 2007).

3

a class A misdemeanor and may be punished by up to one year in prison and a fine of as much as $100,000. *See* 42 U.S.C. § 14135a(a)(5); 18 U.S.C. §§ 3571, 3581.

The contents of the countrywide database — *e.g.*, the DNA profiles derived from analyzing individuals' tissue samples — may be disclosed only for purposes specified by the DNA Act. Such disclosure is permitted:

(A) to criminal justice agencies for law enforcement identification purposes;
(B) in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules; and
(C) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged.

42 U.S.C. § 14133(b)(1).[2] Conversely, the Act proscribes unauthorized disclosures, imposing penalties of up to one year in prison and a fine of as much as $250,000. *See* 42 U.S.C. § 14135e(c). Moreover, it provides for the expungement of an individual's DNA information if the felony conviction is reversed or dismissed. *See* 42 U.S.C. § 14132(d).

The federal statute also fixes which felons are required to submit a DNA sample. Originally, the list of qualifying federal offenses was limited to: (a) murder, voluntary manslaughter, or other offense relating to homicide; (b) an offense relating to sexual abuse, to sexual exploitation or other abuse of children, or to transportation for illegal sexual activity; (c) an offense relating to peonage and slavery; (d) kidnaping; (e) an offense involving robbery or burglary; (f) any violation of 18 U.S.C. § 1153, which concerns offenses committed "within the Indian Country" involving murder, manslaughter, kidnaping, maiming, a felony offense relating to sexual abuse, incest, arson, burglary, or robbery; and (g) any attempt or conspiracy to commit any of the above offenses. *See* 2000 DNA

---

[2] In addition, the statute allows disclosure "*if personally identifiable information is removed*," for a population statistics database, research and development of identification methods, and quality control purposes. 42 U.S.C. § 14133(b)(2) (emphasis added).

4

Act, Pub. L. No. 106-546 (originally codified at 42 U.S.C. § 14135a(d)). In 2001, as part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. L. No. 107-56, 115 Stat. 272, Congress extended the definition of qualifying federal offenses to include crimes involving terrorism and crimes of violence. *See* Pub. L. No. 107-56 § 503.

This amended list of qualifying offenses was again revised in 2004. The 2004 DNA Act provides that "[a]ny felony" constitutes a qualifying federal offense. *See* 42 U.S.C. § 14135a(d)(1). As a result of the change, persons convicted of crimes that are neither violent nor sexual in nature are also required to deposit a DNA sample for analysis and storage.

Appellants in these consolidated cases are two such individuals. On November 2, 2004, Appellant Karen Amerson pleaded guilty to one count of bank larceny in violation of 18 U.S.C. § 2113(b). She had been caught redirecting over a period of years a total of approximately $13,500 from the federally-insured bank for which she worked. Consistent with a plea agreement reached by the parties, the District Court for the Western District of New York (Skretny, *J.*) sentenced Amerson to three years of probation. In addition, the District Court, over Amerson's objection, insisted that she supply a DNA sample under the newly-amended federal law.

Similarly, Appellant Julius Graves pleaded guilty, on October 4, 2004, to one count of aiding and abetting wire fraud in violation of 18 U.S.C. §§ 2, 1343. Graves had knowingly allowed a neighbor to ship to his home merchandise purchased with stolen credit card information. The District Court (Skretny, *J.*) sentenced Graves to two years probation and, over his objection, instructed him to provide a DNA sample as well.

In both instances, the District Court concluded that the Fourth Amendment presented no

5

obstacle to the 2004 DNA Act's requirement that all felons submit a DNA sample for testing and storage. Appellants filed timely appeals, and we consolidated the cases to consider the common Fourth Amendment challenge asserted by Appellants.

DISCUSSION

The Fourth Amendment prohibits unreasonable searches and seizures. It is settled law that DNA indexing statutes, because they authorize both a physical intrusion to obtain a tissue sample and a chemical analysis to obtain private physiological information about a person, are subject to the strictures of the Fourth Amendment. *See Nicholas*, 430 F.3d at 656 n.5, 658 ("[T]he extraction and analysis of plaintiffs' blood for DNA-indexing purposes constitute[s] a search implicating the Fourth Amendment."); *see also Skinner v. Ry Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989); *Cupp v. Murphy*, 412 U.S. 291, 295 (1973) (explaining that a search that goes "beyond mere physical characteristics . . . constantly exposed to the public . . . constitute[s] the type of severe, though brief, intrusion upon cherished personal security that is subject to constitutional scrutiny" (internal citation and quotation marks omitted)).

Moreover, suspicionless searches — such as those permitted by the 2004 DNA Act — are highly disfavored since they dispense with the traditional rule that a search, if it is to be deemed reasonable, must be either supported by a warrant based on probable cause, or justified by evidence establishing individualized suspicion of criminal misconduct. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) ("A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.").

6

Nonetheless, courts have nearly unanimously upheld the suspicionless-search programs created by state and federal DNA indexing laws.[3] In so doing, federal courts have adopted two somewhat different approaches. On the one hand, the Third, Fourth, Fifth, Ninth, and Eleventh Circuits have relied on a balancing test that accounts for the totality of the circumstances. *See United States v. Sczubelek*, 402 F.3d 175, 184 (3d Cir. 2005); *Jones v. Murray*, 962 F.2d 302, 307-08 (4th Cir. 1992); *Groceman v. U.S. Dep't of Justice*, 354 F.3d 411, 413-14 (5th Cir. 2004); *United States v. Kincade*, 379 F.3d 813, 832 (9th Cir. 2004) (en banc); *Padgett v. Donald*, 401 F.3d 1273, 1280 (11th Cir. 2005). This Court and the Seventh Circuit, on the other hand, have applied the "special-needs" test to uphold the constitutionality of earlier DNA indexing laws. *See Nicholas*, 430 F.3d at 667; *Green v. Berge*, 354 F.3d 675, 679 (7th Cir. 2004); *Marcotte*, 193 F.3d at 77.[4]

We agree with appellants that the special-needs test remains the proper framework, in this Circuit, for analyzing the constitutionality of a DNA indexing statute when applied to probationers. We first adopted the special-needs doctrine as the mode of analysis for assessing the constitutionality of DNA indexing statutes in *Marcotte*, 193 F.3d at 78-79. The Appellees argue that *United States v. Knights*, 534 U.S. 112 (2001) — a case decided two years after *Marcotte* — undermines the logic

[3] All the federal circuits that have considered the question have upheld the state and federal DNA indexing laws, as have the overwhelming majority of district courts and state courts. *See United States v. Kincade*, 379 F.3d 813, 830-31 & n.25 (9th Cir. 2004) (en banc) (citing over 30 decisions in which courts have upheld DNA indexing statues, and noting that it could find only two occasions in which a court held such a law unconstitutional). A panel of the Ninth Circuit originally struck down an earlier version of the federal statute, *United States v. Kincade*, 345 F.3d 1095, *vacated and reh'g en banc granted*, 354 F.3d 1000 (9th Cir. 2003), but that decision was overturned by the *en banc* court. *Kincade,* 379 F.3d at 830.

[4] The Sixth Circuit recently analyzed the 2004 DNA Act under both the special-needs test *and* the totality of the circumstances balancing test and found the Act constitutional under either approach. *United States v. Conley*, 453 F.3d 674, 677-81 (6th Cir. 2006). It is not clear which of these two approaches the Tenth Circuit uses. *Compare Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir. 1996) (applying balancing test), *with United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir. 2003) (applying special-needs doctrine); *see also Banks*, 415 F. Supp. 2d at 1260 (conducting a balancing analysis after *Kimler* on the ground that *Kimler* only made a "rogue reference to the special-needs exception").

of *Marcotte* and establishes that a general balancing test can be used to evaluate a suspicionless search of a probationer. A panel of this court considered and rejected this argument in *Nicholas*. 430 F.3d at 664-67. *Nicholas*, which was decided after we heard argument in the appeals before us, carefully examined the Supreme Court's decision in *Knights*, and concluded that the approval of the probationer search in *Knights* was based, in significant part, on the existence of individualized suspicion, and for that reason was made subject to a general balancing test. *Id*. at 665.

After the present case was argued and *Nicholas* was issued, the Supreme Court decided *Samson v. California*, 126 S. Ct. 2193 (2006), in which a general balancing test was applied to determine the validity of a suspicionless search of a parolee. The *Samson* majority based its holding on the "severely diminished expectations of privacy" a parolee faced, explicitly noting that in their expectation of privacy "parolees are more akin to prisoners than probationers." *Id*. at 2198-99 & n.2. Whether the Supreme Court would ultimately find that *probationers*' expectations of privacy are also sufficiently diminished to permit suspicionless searches of them on the basis of a general balancing test, we do not need to decide today.[5]

Prior to *Samson*, special needs was the generally applicable framework in our Circuit for analyzing suspicionless- search regimes. And in *United States v. Lifshitz*, 369 F.3d 173, 180-81 (2d Cir. 2004), we specifically held that special needs was the proper framework for analyzing suspicionless searches of probationers. While after *Samson* it can no longer be said that "[t]he Supreme Court has never applied a general balancing test to a suspicionless-search regime,"

---

[5]  We also need not, and do not, decide whether in the wake of *Samson*, *Nicholas*'s holding—that, as applied to *prisoners*, special needs is the proper framework for analyzing DNA indexing statutes—remains good law. The issue is not before us. But since the Supreme Court stated in *Samson* that prisoners have at least as diminished expectations of privacy as parolees, *Samson*, 126 S. Ct. at 2198, *Nicholas*'s holding *as applied to prisoners* may well have been undermined by *Samson*. In contrast, however, nothing in *Samson* undercuts *Nicholas*' interpretation of *Knights*.

*Nicholas*, 430 F.3d at 666, nothing in *Samson* suggests that a general balancing test should replace special needs as the primary mode of analysis of suspicionless searches outside the context of the highly diminished expectation of privacy presented in *Samson*. And, since *Samson* we have continued to apply the special-needs test in examining various suspicionless-search regimes. *See Cassidy v. Chertoff*, 471 F.3d 67, 74-75 (2d Cir. 2006) (applying the special-needs test to analyze a programmatic suspicionless search of ferry passengers); *MacWade v. Kelly*, 460 F.3d 260, 267-69 (2d Cir. 2006) (applying the special-needs test to analyze a programmatic suspicionless search of subway passengers).

Because the Supreme Court has not, to date, held that the expectations of privacy of *probationers* are sufficiently diminished to permit probationer suspicionless searches to be tested by a general balancing test — and, to the contrary, in *Samson* the Court expressly acknowledged that probationers have a greater expectation of privacy than the parolees — *Samson* does not require us to reconsider our holding in *Lifshitz*. We, therefore, must follow *Lifshitz* and apply the special-needs test to the suspicionless searches of probationers that are at issue in these appeals.[6]

Accordingly, we analyze the constitutionality of the 2004 DNA Act as it applies to Appellants under the two-prong special-needs approach. First, in Part I, we consider whether the

---

[6] In any event, as we noted in *Nicholas*, the special-needs test, as applied in this circuit, is "more stringent" than the general balancing test. *Nicholas*, 430 F.3d at 664 n.22 (explaining that the special-needs test was more rigorous than the general balancing test because "[t]he special needs exception requires the court to ask two questions. First, is the search justified by a special need beyond the ordinary need for normal law enforcement? Second, if the search does serve a special need, is the search reasonable when the government's special need is weighed against the intrusion on the individual's privacy interest? A general balancing test, on the other hand, only requires the court to balance the government's interest in conducting the search against the individual's privacy interests." (internal citations omitted)). Since we conclude that the government has shown a "special need" for the DNA Act, the second prong of our analysis, the balancing of the government interests versus the individual's privacy interests is very similar to the balancing we would conduct under a general balancing test. Thus, for all of the reasons stated in Part II, had we concluded that it was appropriate to apply a general balancing test to suspicionless searches of probationers — which we did not — we would have reached the same result that we do under the special needs test.

9

search and seizure is justified by a special need beyond the ordinary needs of normal law enforcement. Concluding that under *Nicholas* it is, we examine in Part II whether the search was reasonable in light of that special need. We do so by weighing the government's interest against the intrusion on the Appellants' privacy interests.

**I. The Existence of a "Special Need"**

When law enforcement officials undertake a search to discover evidence of criminal wrongdoing, the Fourth Amendment's requirement of reasonableness generally mandates that the officers have both probable cause and a search warrant. The Supreme Court, however, has recognized that a warrantless, suspicionless search may be justified "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotation marks omitted). Since the advent of the special needs doctrine in *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, *J.*, concurring), a variety of special needs distinct from ordinary law enforcement have been found to justify suspicionless searches in different contexts. *See generally Nicholas,* 430 F.3d at 660-61; *Cassidy*, 471 F.3d at 74-75 (collecting cases).

In a trio of cases, the Supreme Court recently clarified the relationship between "special needs" and law enforcement objectives. In *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), the Court struck down an automobile checkpoint program "whose primary purpose was to detect evidence of ordinary criminal wrongdoing," explaining that this type of "general interest in crime control" could not qualify as a special need. *Id.* at 41-42 (citation and internal quotation marks omitted). Subsequently in *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), the Court held unconstitutional a hospital program that tested patients urine for cocaine use, finding that because

10

the "immediate objective of the searches was to generate evidence for law enforcement purposes" the search program did not qualify as a special need. *Id.* at 83-84 (emphasis omitted).

The Appellants argue that *Edmond* and *Ferguson* are controlling here because the 2004 DNA Act's primary objective is law enforcement. We might perhaps have agreed had *Edmond* and *Ferguson* been the last word on the subject. *See Nicholas*, 430 F.3d at 673 (Leval, *J.*, concurring). But in *Illinois v. Lidster*, 540 U.S 419 (2004), the Supreme Court clarified that under *Edmond* and *Ferguson,* some law enforcement objectives still qualify as special needs. Applying the special needs doctrine, the *Lidster* Court upheld the constitutionality of a checkpoint whose primary purpose was to gather *information* from motorists who might have witnessed a fatal hit-and-run accident the week before. *Id.* at 423.

In *Nicholas*, we considered these precedents and concluded that under the Supreme Court's holdings, "not all law-enforcement concerns . . . fall outside of the special-needs exception . . . ." 430 F.3d at 663. Rather, while "normal law-enforcement objectives" cannot qualify as special needs, "some 'special law enforcement concerns'" will justify suspicionless searches under the special-needs doctrine. *Id.* (quoting *Lidster*, 540 U.S. at 424). *Nicholas* stated that the appropriate inquiry to determine whether a suspicionless-search regime qualified as a special need was whether the search "serve[s] as [its] immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation." *Id*. at 663.

Applying this standard, we held in *Nicholas* that "a DNA-indexing statute that aims to create a DNA-identification index to assist in solving crimes" constituted a "special need." *Id*. at 668-69; *see also Green*, 354 F.3d at 678 ("Although the state's DNA testing of inmates is ultimately for a law enforcement goal, it seems to fit within the special-needs analysis the court has developed for

drug testing and searches of probationers' homes, since it is not undertaken for the investigation of a specific crime.").

*Nicholas* concluded that the New York statute's "primary purpose is to create a DNA database to assist in solving crimes should the investigations of such crimes permit resort to DNA testing of evidence."[7] 430 F.3d at 668 (internal citation and quotation marks omitted). This, we explained, constituted a "special need" because

> [a]lthough the DNA samples may eventually help law enforcement identify the perpetrator of a crime, at the time of collection, the samples in fact provide no evidence in and of themselves of criminal wrongdoing, and are not sought for the investigation of a specific crime. Because the state's purpose in conducting DNA indexing is distinct from the ordinary crime detection activities associated with normal law-enforcement concerns, it meets the special-needs threshold.

*Id.* at 668-69 (internal citations and quotation marks omitted).

We agree with all the parties that the primary purpose of the 2004 DNA Act is to obtain a reliable record of an offender's identity that can then be used to help solve crimes. *See, e.g.*, 146 Cong. Rec. H8572-01, H8575 (daily ed. Oct. 2, 2000) (statement of Rep. Canady) ("The purpose of [CODIS] is to match DNA samples from crime scenes where there are no suspects with the DNA of convicted offenders. Clearly, the more samples we have in the system, the greater the likelihood we will come up with matches and solve cases."); *id. at* H8576 (statement of Rep. Scott) (explaining that the Act will "save lives by allowing apprehension and detention of dangerous individuals while eliminating the prospects that innocent individuals would be wrongly held for crimes that they did not commit"); H.R Rep. No.108- 711, at 2 (2004) ("[T]he Justice For All Act of 2004 . . . seeks to ensure that the true offender is caught and convicted for the crime.").

---

[7] In *Edmond* and *Ferguson*, the Supreme Court instructed that courts must look only at the "primary" purpose of a search regime in determining whether the program qualifies as a special need. *Edmond*, 531 U.S. at 46; *Ferguson*, 532 U.S. at 81.

12

Since we see no meaningful difference between the purpose of the New York statute in *Nicholas* and the federal statute at issue here, the clear holding of *Nicholas* controls our threshold inquiry as to whether there is a "special need." We pause, however, to emphasize two points that we believe are implicit in *Nicholas*.

First, we note that, as in all cases in which there is a special need, what makes the government's need to create a DNA database "special," despite its relationship to law enforcement, is (as a matter of first principles) its incompatibility with the normal requirements of a warrant and probable cause, and, especially, the corollary that the nature of the search involved greatly attenuates the risks and harms that the warrant and probable cause requirements are intended to protect against. As Judge Lynch explained in his concurrence in *Nicholas*, "special needs" have been found "not because the rules [of warrants and probable cause] are inconvenient to follow," but rather "because in such situations, the rules are not needed to prevent the mischief that they are designed to prevent." *Nicholas*, 430 F.3d at 680 (Lynch, *J.*, concurring). Because the purpose of collecting DNA samples is to obtain identifying information, not to uncover evidence of wrongdoing or to solve a particular crime, the imposition (like that involved in the stop in *Lidster*) is one in which "by definition, the concept of individualized suspicion has little role to play." *Lidster*, 540 U.S. at 424; *see also id.* at 425 ("[A]n information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual.").

The taking of DNA samples, unlike a normal law enforcement investigation, does not involve any suggestion that the individual is being suspected of having committed a crime (other than the one of which he had already been convicted). Nor does it force the individual to provide evidence to exonerate herself from a crime in which the government had no reason to think she was involved.

13

Perhaps more importantly, the programmatic nature of the 2004 DNA Act — all felons are required to submit DNA samples, and the uses of those samples are strictly circumscribed — leaves no discretion for law enforcement personnel to decide whether to force an individual to submit to a taking of a DNA sample or how to use the information collected.[8] This lack of discretion removes a significant reason for warrants — to provide a check on the arbitrary use of government power. *See Skinner*, 489 U.S. at 621-22 ("An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents."); *see also Marcotte*, 193 F.3d at 79 ("[T]raditional concerns of probable cause and reasonable suspicion are minimized by the [Connecticut DNA indexing] statute's blanket approach to testing.").

Second, we emphasize that collecting felons' DNA samples constitutes a "special need" (despite its relationship with law enforcement) not simply because it does not involve the "normal" law enforcement objective of uncovering evidence that is itself proof of the commission of a specific crime, but also because the "special" law enforcement activity of creating and maintaining a DNA index fulfills important purposes that could not be achieved by reliance on "normal" law enforcement methodology. Maintaining a database of DNA profiles of convicted offenders offers both qualitative and quantitative advantages over the alternatives — reliance on non-DNA-based identification or, each time there is a crime, collecting DNA samples from those as to whom there is sufficient suspicion. One, the DNA index has the potential to help society catch the perpetrator of crimes that otherwise would remain unsolved forever. Two, maintaining the DNA database offers

---

[8] Significantly, we note that because of the blanket nature of the program, the collection of DNA here is not linked to (a) investigating a particular crime committed by these defendants, or (b) (at least directly) to the likelihood of these defendants' committing a future crime**.**

14

unparalleled speed and, more importantly, accuracy in solving crimes. Three, and of particular importance, the database not only allows for the rapid identification of the actual perpetrator, but also prevents misidentification and, thereby, permits innocent individuals to be excluded, rapidly and without being forced to suffer the indignity of being suspected of crimes that they did not commit. Critically, one of the fundamental characteristics of the database is that it can be used to exonerate individuals that could or do stand accused of crimes for which they are innocent. *See* 42 U.S.C. § 14133(b)(1)(C) (allowing for disclosure of samples in CODIS to a defendant "for criminal defense purposes."); *see also* House Rep. No. 106-900(I), at *10 ("Promptly identifying the actual perpetrator of a crime through DNA matching exonerates any other persons who might wrongfully be suspected, accused, or convicted of the crime.").[9]

We, therefore, have no trouble in concluding that the testing required by the DNA Act qualifies as a special need. We turn, then, to the second prong of our inquiry, the reasonableness of the search in light of this special need.

**II. Special Needs Reasonableness Balancing Test**

Holding that collecting DNA samples to create a DNA index qualifies as a special need is the beginning, not the end of a Fourth Amendment analysis. For, the "ultimate measure of the constitutionality of a governmental search is reasonableness." *Cassidy*, 471 F.3d at 74 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995)) (internal quotation marks omitted). As a result, the fact that the government has a "special need" does not mean the search and seizure is

---

[9] This availability of the DNA database to the defense has special importance to *anyone* convicted in the past since they can be easily made part of a photo lineup by the police. As a result, they are especially likely to be suspected of a crime, correctly, or falsely. In this respect we note that while the defendants point out that they "do[] not want or need to be exonerated of crimes [they] did not commit," the interest involved here is not simply a personal interest that can be waived, but a much broader societal interest, in minimizing wrongful accusations and convictions, which is served by having a robust database.

"automatically, or even presumptively" constitutional.[10] *Lidster*, 540 U.S at 425. Rather we are required to judge reasonableness and thus constitutionality on the basis of a context-specific inquiry, and weigh, in view of the individual circumstances presented, "the government conduct—in light of the special need and against the privacy interest advanced." *Cassidy*, 471 F.3d at 75 (quotation and citation omitted); *see also Lidster*, 540 U.S at 427. We have recently reaffirmed that this balancing test is to be based on an examination of three factors: "(1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs." *Cassidy*, 471 F.3d at 75. So defined, the more attenuated the government's need the more minimal must the invasion of privacy be to be countenanced under the Fourth Amendment.

*A. The nature of the privacy interest involved and the character and degree of the government intrusion*

Probationers, such as appellants, have diminished — but far from extinguished — reasonable expectations of privacy. Probation "is one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Samson*, 126 S. Ct. at 2197 (citations and internal quotation marks omitted). While probationers have significantly higher reasonable expectations of privacy than those currently incarcerated, *see id.* at 2198 ("On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."), "inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled," *Knights*, 534 U.S. at 119 (internal quotation marks omitted). It is

---

[10] The use of the term "special" does not imply otherwise. The need is "special" in the context of the Fourth Amendment, not because it is necessarily or likely to be more important than other needs, but because the normal presumption that warrants and probable cause are needed is not present.

in this context of a reduced expectation of privacy that the government's intrusion on the defendant's interests must be considered.

In *Nicholas* we identified two privacy interests involved in the taking of DNA samples for indexing purposes. First, "offenders are subject to a physical intrusion when they are required to provide the DNA sample, whether by blood sample or buccal cheek swab." *Nicholas*, 430 F.3d at 669. These intrusions are subject to the strictures of the Fourth Amendment, of course. But "[t]he Supreme Court has long maintained that the intrusion effected by taking a blood sample, . . . is minimal." *Id.* (citing *Skinner*, 489 U.S. at 624); *see Skinner*, 489 U.S. at 625 ("[T]he intrusion occasioned by a blood test is not significant, since such 'tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.' . . . '[S]ociety's judgment [is] that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity.'" (quoting *Schmerber v. California*, 384 U.S. 757, 771 (1966), and *Winston v. Lee*, 470 U.S 753, 762 (1985))). The same can be said of all the common methods of obtaining the DNA sample.[11]

Appellants' status as probationers, and their associated diminished expectation of privacy make this physical intrusion even less invasive. In particular, we note that it is a commonly accepted condition of probation that the probationer submit to drug tests, with the result that, often, the

---

[11] The Act does not specify a method of collection, but simply requires a "tissue, fluid, or other bodily sample" for analysis. 42 U.S.C. §§ 14135a(c)(1). There is nothing in the record about which collection method would here be employed. But all parties appear to assume that it would be by blood test. *Cf. Kincade*, 379 F.3d at 817 (suggesting that as of 2004, FBI guidelines required all federal offenders to submit to blood draws to obtain the DNA samples). Given this, we too will assume for the purposes of our analysis that the method of collection would be a blood test, which is the most intrusive of the usual collection techniques. If instead, the DNA were to be collected by cheek swab, there would be a lesser invasion of privacy because a cheek swab can be taken in seconds without any discomfort.

17

requisite DNA sample can be collected without any incremental intrusion. And if a blood sample needs to be taken solely for the purpose of the DNA collection — which seems likely to be the case for the defendants before us — this readily can be done at a time when the probationers are under government control for other reasons, e.g., reporting, thereby greatly limiting any time burden that might be imposed.

There is, however, a second and potentially much more serious invasion of privacy occasioned by the DNA Act. As we recognized in *Nicholas*, the "analysis and maintenance of [offenders'] information" in CODIS, the federal database is, in itself, a significant intrusion. *Nicholas*, 430 F.3d at 670.[12] We are mindful of the vast amount of sensitive information that can be mined from a person's DNA and the very strong privacy interests that all individuals have in this information. *See, e.g.*, *Kincade*, 379 F.3d at 843 (Reinhardt, *J.*, dissenting) (discussing concerns about the "profound social effects" of "allowing the government to collect and maintain private information about the intimate details of our lives . . . ." (internal citation and quotation marks omitted)). Nevertheless, we are persuaded — as our Court was when it considered the New York and Connecticut DNA indexing statutes*, see Nicholas*, 430 F.3d at 670; *Marcotte*, 193 F.3d at 80, that the federal statute provides adequate safeguards to insure that the privacy invasion occasioned by the maintenance of the DNA profiles is minimized. The so-called "junk-DNA" sequences stored in CODIS are not currently associated with any known physical or medical characteristics.[13] *See* H.R.

---

[12] As we noted in *Nicholas*, this can be considered either a search or a seizure. *Nicholas*, 430 F.3d at 670. The invasion of privacy analysis is the same either way. *Id.*

[13] Should the uses to which "junk DNA" can be put be shown in the future to be significantly greater than the record before us today suggests, a reconsideration of the reasonableness balance struck would be necessary. *Cf. Nicholas*, 430 F.3d at 670 ("[T]he New York statute as written does not provide for sensitive information to be analyzed or kept in its database. Rather, it provides only for the analysis of identifying markers. The junk DNA that is extracted has, at present, no known function, except to accurately and uniquely establish identity. Although science may someday be able to unearth much more

18

Rep. No. 106-900(I), at * 27. Moreover, the Act severely limits the circumstances and purposes for which the DNA profiles can be released and provides significant penalties for any misuse of the DNA samples or profiles.

As a result, at least in the current state of scientific knowledge, the DNA profile derived from the offender's blood sample establishes only a record of the offender's identity. *See Kincade*, 379 F.3d at 818. And, other circuits have concluded that a convicted felon has no expectation of privacy in his or her identity. *See, e.g.*, *Sczubelek*, 402 F.3d at 184 ("After . . . conviction of a felony, [an offender's] identity became a matter of compelling interest to the government, and [the] marks of identification [taken when arrested], the fingerprints and the photographs, bec[o]me a permanent record. [The offender] can no longer assert a privacy interest in these means of identification. His DNA is a further — and in fact more reliable — means of identification."); *cf. Jones*, 962 F.3d at 306 ("[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it.").

While we do not hold that a probationer has *no* expectation of privacy in his or her identity, we agree that, like all convicted felons, a probationer's expectation of privacy in his or her identity is severely diminished. As we explained in *Nicholas*, "[g]iven the limits imposed on the collection, analysis, and use of DNA information by the statute, we see the intrusion on privacy effected by the statute as similar to the intrusion wrought by the maintenance of fingerprint records," which are collected as a part of everyday routine booking procedures. 430 F.3d at 671. As a method of identification, DNA differs primarily from fingerprinting in its greater accuracy. And, we do not

information about us through our junk DNA, that capability does not yet exist, and, more importantly, the New York statute prohibits such analysis.") (internal citations omitted); W. Wayt Gibbs, *The Unseen Genome: Gems Among the Junk*, *Sci. Am.*, Nov. 2003, at 29 (describing recent studies that have begun to question the notion that "junk DNA" does not contain any useful genetic information).

19

believe that this greater accuracy meaningfully increases the privacy concerns. Indeed, arguably, the more accurate the identification method the less intrusive it is because of the associated reduced risk that the sample will result in misidentification. As a result, we conclude that for probationers, as for the incarcerated felons in *Nicholas*, "[g]iven that the state likely already has a plethora of identifying information about [them], in light of their status as convicted felons," *id.*, the additional intrusion of privacy entailed by the taking of the DNA sample is small.[14]

We acknowledge that the DNA profile of appellants will be stored in CODIS, and potentially used to identify them, long after their status as probationers — and the reduced expectation of privacy that such a status involves — has ended. But we do not believe that this changes the ultimate analysis. For we have upheld, in the past, the retention and use of information properly collected under the Fourth Amendment, if there was a strong enough public interest in retaining it, when there no longer was a diminished expectation of privacy. In particular, it is well established that the state need not destroy records of identification — such as fingerprints, photographs, etc. — of convicted felons, once their sentences are up. *See, e.g.*, *United States v. Schnitzer*, 567 F.2d 537, 539-40 (2d Cir. 1977) (holding that except for in extraordinary circumstances, the government is not required to return photographs or fingerprints taken incident to a lawful arrest or expunge an arrest record even when the arrestee is acquitted); *cf.* 28 U.S.C. § 534(a)(1) (requiring the Attorney General to "acquire, collect, classify, and *preserve*" criminal identification records) (emphasis added). The same applies to DNA. *See Nicholas*, 430 F.3d at 671 n.32 ("Thus, even though some plaintiffs are no longer prisoners, and may thus claim a greater expectation of privacy than they held while

---

[14] Many of the arguments that this Court made seventy-five years ago in upholding the constitutionality of fingerprinting of arrestees — the modern technology of that day — apply equally in our own time to DNA identification. *See United States v. Kelly*, 55 F.2d 67 (2d Cir. 1932).

incarcerated, we still find that — in light of the fact that the state regularly maintains identifying records of former inmates — the privacy intrusion remains relatively minimal."); *see also Green*, 354 F.3d at 680 (Easterbrook, *J.*, concurring) ("[T]he fourth amendment does not control how properly collected information is deployed. Use of DNA is in this respect no different from use of a fingerprint . . . .").

Finally, it is significant that the systematic collection of probationers' DNA samples under the Act has the potential to provide a net gain in privacy for the individuals who are required to provide samples. Having DNA on file may very well help to exculpate such individuals by avoiding misidentification and, thus, preventing much more serious invasions of their privacy in the future.

In the end, even taking the two privacy interests together, as of course we must, we conclude that, given the appellants' status as probationers, the intrusion on their privacy interests from being compelled to provide DNA samples for CODIS is quite small. In this respect, we wish to emphasize again, *see supra* note 13, that our analysis of the privacy interests at stake is highly context dependent. And we underscore that were we faced with evidence of misuse of the DNA samples or scientific advances concerning the information that can be mined from the DNA footprint stored on the CODIS database, *see Kincade*, 379 F.3d at 850 (Reinhardt, J., dissenting) (warning of the potential *in the future* for the DNA fingerprint entered into CODIS to reveal information about a persons sex, race, genetic defects, predispositions to diseases, and other genetic predispositions), our analysis and ultimate conclusions might very well be different. *See Nicholas*, 430 F.3d at 670-71 ("Although plaintiffs and amici suggest that New York's [DNA database] statute could permit the state to use DNA for more harmful purposes than maintaining an identification database, those facts are not present here, and if they should arise, no doubt a different calculus under the special-needs

21

analysis would result."). But, as of now, and under the current law, the privacy intrusion on these appellants is extremely limited. And it is against this limited privacy interest that we must weigh the government's interest in the DNA Act.

*B. The government interest*

We weigh the intrusion of the 2004 DNA Act on probationers' privacy against "the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs." *Cassidy*, 471 F.3d at 75. Courts, including our own, that have considered the issue before us, have concluded that the government has a "strong," even "compelling" and "monumental," interest in obtaining and storing accurate identifying information from convicted offenders. *See, e.g.*, *Nicholas*, 430 F.3d at 669; *Sczubelek*, 402 F.3d at 185; *Kincade*, 379 F.3d at 839.

There can be little doubt that the government has a compelling interest in rapidly and accurately solving crimes and that having DNA-based records of the identity of as many people as possible, and especially past offenders, effectuates this interest. As the Fourth Circuit explained in *Jones*:

> The individuality of the DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime within samples of blood, skin, semen or hair follicles. The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.

*Jones*, 962 F.2d at 307.

The greater accuracy and speed with which CODIS allows the government to apprehend and convict those guilty of crimes has, as we have seen, an equally important corollary — its use in exonerating innocent people criminally suspected, convicted, or charged. *See generally McKithen*

22

*v. Brown*, __ F.3d __, 2007 U.S. App. LEXIS 5763, * 2 & nn.1-3, * 45-52 (2d Cir. Mar. 13, 2007). In this respect, it is critical to our overall weighing of the governmental interest that the DNA Act gives criminal defendants access to DNA samples and analyses performed in connection with their case. Moreover, the DNA Act also serves an important government interest by preventing innocent individuals — whose DNA does not match the DNA collected at the crime scene — from even becoming potential suspects. By so doing it protects large numbers of people from having to suffer one of the central indignities with which the Fourth Amendment has historically been concerned — being made a suspect for a crime that one did not commit. *Cf. Kincade*, 379 F.3d at 839 n.38 ("[W]hile it undoubtedly is true that the wrongly-accused can voluntarily submit to DNA testing should the need arise, use of CODIS promptly clears thousands of potential suspects—thereby preventing them from ever being put in that position, and 'advancing the overwhelming public interest in prosecuting crimes *accurately*.'" (internal quotation marks omitted) (emphasis in original)) And, in this respect, we are mindful that convicted felons — whose DNA is being mandatorily collected pursuant to the statute before us — are often, in practice, at particular risk of being accused of subsequent crimes.

Amerson and Graves do not meaningfully dispute that these governmental interests are important. Rather, they suggest that the government does not have any interest in obtaining *their* DNA. Specifically, they question whether there is sufficient evidence that DNA samples are useful in helping deter people like them — non-violent offenders who have been sentenced only to probation for financial crimes — from committing future crimes, and in catching them if they do, to justify the intrusion the DNA Act imposes. In this respect, they contrast recidivism data that they assert is available for other felons, *e.g.*, sexual offenders, and the utility of DNA in identifying the

23

perpetrators of such other crimes, with what they suggest is a lack of data as to their crimes. But even assuming arguendo that this is so, it is essentially beside the point.[15]

To consider the government's interests in DNA testing solely in terms of DNA's capacity to dissuade or to make more easily solvable the crimes that the particular felons being tested might commit in the future is to miss the breadth of the government's proper interest in DNA testing. That interest is, emphatically, not limited to the specific deterrence of the particular offender. (Indeed, if it were, we might question the propriety of a finding that the government had a "special need."[16])

---

[15] As to the accuracy of appellants' assertions, we note first that the Supreme Court has stated that "the very assumption of the institution of probation" is that the probationer "is more likely than the ordinary citizen to violate the law." *Griffin*, 483 U.S. at 880. And the Supreme Court concluded that searches based on that "assumption" effectuate an important state interest, even without a specific showing that the particular types of crimes committed by the defendant also have high recidivism rates. *Id.* Moreover, official government statistics appear to show a high level of recidivism among non-violent offenders, including those convicted of "white collar" crimes. *See, e.g.*, U.S. Dep't of Justice, *Profile of Nonviolent Offenders Exiting State Prisons*, at 2 (Oct. 2004), http://www.ojp.usdoj.gov/bjs/pub/pdf/pnoesp.pdf. ("Within 3 years of their release from prison, about 7 in 10 nonviolent releasees were rearrested for a new crime; nearly half were reconvicted; and more than a quarter were returned to prison."); U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computations of the Federal Sentencing Guidelines*, at 30, Exh. 11 (May 2004), http://www.ussc.gov/publicat/Recidivism_General.pdf. (reporting that, overall, fraud and larceny offenders have only a slightly lower rates of recidivism than other offenders, and that for those with a criminal history, the recidivism rates for these offenses rises to nearly fifty-percent, higher than most types of crimes, including drug trafficking).

And while it is no doubt true, as this Court noted in 1999 that "DNA evidence is particularly useful in investigating sexual offenses," *Marcotte*, 193 F.3d at 79, and the utility of DNA evidence in cases involving as murders and other physical assaults in which blood is left at the crime scene is almost as great, there are also indications that DNA can be, and is increasingly, being used to solve nonviolent crimes. *See, e.g.*, U.S. Dep't of Justice, *DNA in "Minor" Crimes Yields Major Benefits in Public Safety* (Nov. 2004), http://www.ncjrs.gov/pdffiles1/nij/207203.pdf; D.H. Kaye & Michael E. Smith, *DNA Identification Databases: Legality, Legitimacy, and the Case for Population-Wide Coverage*, 2003 WIS. L. REV. 413, 416-17, 416 n.9 (explaining that, in the United Kingdom, DNA evidence has proven useful in investigating numerous burglaries and thefts because the perpetrators had left DNA-bearing material at the crime scenes); H.R. No. 106-900(I), at *29 (letter from Department of Justice) ("[E]xperience indicates that samples collected on the basis of convictions for nonviolent offenses are actually among the most useful in solving crimes, including violent crimes.").

[16] If all that was at issue in the DNA testing was preventing the particular individual tested from committing crimes and solving any future crime he committed, it is unclear whether there would be a meaningful distinction between the DNA testing and the normal law enforcement purpose of investigating and preventing specific crimes through searches to uncover evidence of wrongdoing, which,

Rather, it reflects the whole panoply of societal benefits that stem from the capacity to identify or to exclude individuals, quickly, accurately, and at reasonable expense. And it is this very broad societal interest — *this special need* — that must be balanced against the intrusion that obtaining and storing DNA entails. Viewed in this light, the government's interest in getting appellants' DNA samples is not much attenuated by the fact that appellants are non-violent felons.[17] And appellants' expectation of privacy (as probationers) is no less diminished than that of other categories of probationers. Nor is the degree of intrusion any greater for appellants than for others as to whom DNA testing has been upheld. Under the circumstances, the reasonableness balance can only come out one way. *See Nicholas*, 430 F.3d at 670; *Cassidy*, 471 F.3d at 87.

## CONCLUSION

Taking and storing samples of DNA under the restrictions of the DNA Act fulfills many important governmental interests, only some of which are limited to the criminal history of the subjects of the DNA testing. The invasion of privacy, both immediate, and long term, from DNA testing of convicted felons—even those convicted of non-violent crimes and sentenced only to probation—is, given the safeguards of the 2004 DNA Act, relatively small. Accordingly we conclude that the 2004 DNA Act, as applied to appellants, does not constitute an unreasonable search or seizure and hence does not violate the Fourth Amendment. The judgments of the district court are, therefore, AFFIRMED.

---

the Supreme Court has made clear, cannot be a special need.

[17] One of the elements of the special-needs analysis under *Cassidy* is of course the efficacy of the program in addressing the government's special need. *Cassidy*, 471 F.3d at 75. There is no contention here that the above-mentioned broader governmental interests are not effectively served by collecting DNA under the Act.