STATE of Minnesota, Respondent,

v.

Randolph JOHNSON, Jr., Appellant.

No. A09–0247.

Supreme Court of Minnesota.

Jan. 25, 2012.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, MN, for respondent.

William M. Ward, Chief Hennepin County Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, MN, for appellant.

## OPINION

DIETZEN, Justice.

This case presents the question of whether Minn.Stat. § 609.117, subd. 1(1) (2010), violates the prohibition against unreasonable searches and seizures, or the Equal Protection Clause in either the U.S. or Minnesota Constitutions. Subdivision 1(1) requires a defendant charged with a felony and then convicted of a misdemean-

or arising out of the same set of circumstances "to provide a biological specimen" to determine the person's DNA profile for the limited purpose of criminal identification. Applying the totality-of-the-circumstances test, we conclude that the State's legitimate governmental interests in conducting a search of Johnson to collect a biological specimen for criminal identification purposes outweigh appellant's reduced expectation of privacy following his misdemeanor conviction arising out of the same set of circumstances as his felony charge. Consequently, as applied to Johnson, Minn.Stat. § 609.117, subd. 1(1), does not violate the prohibitions against unreasonable searches and seizures in the U.S. and Minnesota Constitutions. We also conclude that Johnson's equal protection claim fails. Accordingly, we affirm.

In September 2008, Johnson was charged with felony domestic assault in violation of Minn.Stat. § 609.2247, subd. 2 (2010) (prohibiting a person from assaulting a family or household member by strangulation), and misdemeanor fifth-degree assault in violation of Minn.Stat. § 609.224, subd. 1(2) (2010) (prohibiting a person from intentionally inflicting or attempting to inflict bodily harm on another), arising out of an incident in which Johnson allegedly punched and strangled A.J. while Johnson was intoxicated.

Before trial, the State offered to dismiss the felony domestic assault charge in exchange for Johnson's guilty plea to an amended charge of misdemeanor domestic assault in violation of Minn.Stat. § 609.2242, subd. 1(1) (2010) (prohibiting a person from engaging in conduct with the intent to cause another to fear immediate bodily harm). Johnson accepted the offer. At the guilty plea hearing, the parties disagreed about whether Johnson was required to submit a DNA sample pursuant to section 609.117, subdivision 1(1). The

district court allowed the parties to brief the DNA-sample issue, and indicated that if the court ruled against Johnson, he could withdraw his guilty plea. Johnson pleaded guilty to the amended charge, and the district court scheduled a sentencing hearing.

At the sentencing hearing, Johnson argued that the portion of section 609.117, subdivision 1(1), that requires a defendant convicted of a misdemeanor to submit a DNA sample violated the prohibitions against unreasonable searches and seizures and was a denial of equal protection of the laws in violation of the U.S. and Minnesota Constitutions. The district court rejected Johnson's arguments and concluded the statute is constitutional. Johnson chose not to withdraw his guilty plea, and the court entered a judgment of conviction and imposed sentence. Johnson's 90–day sentence was stayed, and Johnson was placed on probation for two years. The conditions of Johnson's probation were, among other things: (1) that he not commit another assault, violate a protection order applicable to him, or interfere with a 911 call; (2) that he complete a domestic violence education program; (3) that he submit to random urinalysis; and (4) that he abstain from alcohol and non-prescribed drugs. The court also ordered the DNA sample, but stayed the order pending appeal.

In a published opinion, the court of appeals affirmed the district court's conclusion that section 609.117, subdivision 1(1), is constitutional as applied to a defendant charged with a felony and then convicted of a misdemeanor arising out of the same set of circumstances. *State v. Johnson*, 777 N.W.2d 767, 772 (Minn.App.2010). The court also denied Johnson's equal protection challenge on the grounds that Johnson failed to identify the category of persons he considers to be similarly situat-

ed to himself, and therefore failed to demonstrate that section 609.117, subdivision 1(1), results in a denial of equal protection of the laws. *Id.* Subsequently, Johnson filed a petition for review, which we granted.

## I.

Johnson argues that Minn.Stat. § 609.117, subd. 1(1), is unconstitutional because it requires a defendant convicted of a misdemeanor to provide a DNA sample in violation of the Fourth Amendment to the U.S. Constitution and Article I, Section 10, of the Minnesota Constitution. The State argues that a defendant charged with a felony and then convicted of a misdemeanor arising out of the same set of circumstances has a reduced expectation of privacy, and that the State's interest in DNA collection outweighs that reduced expectation of privacy; therefore, collecting a DNA sample from that defendant is not an unreasonable search or seizure.

 The constitutionality of a statute presents a question of law, which we review de novo. *State v. Melde,* 725 N.W.2d 99, 102 (Minn.2006). We presume Minnesota statutes are constitutional and will strike down a statute as unconstitutional only if absolutely necessary. *See State v. Behl,* 564 N.W.2d 560, 566 (Minn.1997). The party challenging the constitutionality of a statute must demonstrate beyond a reasonable doubt that the statute violates a constitutional provision. *State v. Bartylla,* 755 N.W.2d 8, 14 (Minn.2008).

To answer the question presented, we must examine the statutes that authorize the collection of a biological specimen and

the provisions of the U.S. and Minnesota Constitutions that prohibit unreasonable searches and seizures, and then apply the constitutional protections to the statutes at issue in this case.

Section 609.117, subdivision 1, provides that a

court shall order an offender to provide a biological specimen for the purpose of DNA analysis as defined in section 299C.155 when: (1) the court sentences a person charged with committing or attempting to commit a felony offense and the person is convicted of that offense or of any offense arising out of the same set of circumstances.[1]

It is undisputed that Johnson, who was charged with felony domestic assault by strangulation and then convicted of misdemeanor domestic assault "arising out of the same set of circumstances," was convicted of a crime that satisfies the requirements of section 609.117, subdivision 1(1).

Section 609.117, subdivision 1, incorporates the definition of "DNA analysis" in section 299C.155, subdivision 1. DNA analysis means "the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another human biological specimen for identification purposes." Minn.Stat. § 299C.155, subd. 1 (2010). Thus, the term "DNA analysis" is expressly limited to the collection and analysis of a biological sample for identification purposes. *Id.; accord* Minn.Stat. § 299C.09 (2010). Section 609.117, subdivision 1, does not authorize the collection of a biological sample for any other purpose.[2]

---

1. The dissent suggests that Minn.Stat. § 609.117 compels the collection of "biological specimens from persons merely charged for certain crimes." But the plain language of section 609.117 requires a conviction before a biological sample may be collected.

2. The dissent argues that the State has failed to establish that the collection of a biological specimen to obtain highly personal genetic information is a reasonable search. But that is not the issue before the court. Rather, the question is whether the collection of a biologi-

The DNA collection authorized by section 609.117, subdivision 1, is conducted using uniform procedures and protocols. Minn.Stat. § 299C.155 (2010). A biological specimen may be collected using a buccal swab, which involves "gently swab[bing] the inside of the cheek [with a sterile cotton swab]." Minn. Dep't of Pub. Safety, *Guide to DNA Analysis* 1 (2003). The DNA profile (which does not contain the person's full DNA sequence) is placed in a database that is linked to the National DNA Offender Database (CODIS). *Id.* at 3; Nat'l Inst. of Justice, *The Future of Forensic DNA Testing* 19–20 (2000). To ensure privacy, personal identifiers such as social security number and case-related information are not stored in the CODIS database. Nat'l Inst. of Justice, *supra,* at 20. The DNA profiles stored in the database may be accessed by authorized law enforcement personnel solely for law enforcement identification purposes. Minn. Stat. § 299C.155, subd. 3; *see also* 42 U.S.C. § 14132(b)(3)(a) (2006).

■ The precise question we must decide is whether the collection of biological specimens for identification purposes authorized by section 609.117, subdivision 1(1), is an unreasonable search and seizure in violation of the U.S. and Minnesota Constitutions. The Fourth Amendment to the U.S. Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The language of Article I, Section 10, of the Minnesota Constitution is identical. "The touchstone of the Fourth Amendment is reasonableness. . . ." *United States v. Knights,* 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Generally, the reasonableness of a search depends upon whether the government has complied with the Warrant Clause by obtaining a warrant from a neutral magistrate based upon probable cause. *United States v. U.S. District Court,* 407 U.S. 297, 315–16, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Applying a totality-of-the-circumstances test that balances the State's interests against the intrusion into an individual's privacy, the U.S. Supreme Court has carved out a number of exceptions to the Warrant Clause. *Knights,* 534 U.S. at 118–19, 121–22, 122 S.Ct. 587.

Recently, the Supreme Court applied the totality-of-the-circumstances test to cases involving warrantless searches of probationers and parolees convicted of a felony. *Samson v. California,* 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006); *Knights,* 534 U.S. at 118–19, 122 S.Ct. 587. In *United States v. Knights,* the Court considered whether a warrantless search of a probationer's apartment supported by reasonable suspicion and authorized by a condition of his probation was reasonable "under [the Court's] general Fourth Amendment approach of examining the totality of the circumstances." 534 U.S. at 118, 122 S.Ct. 587 (internal quotation marks omitted) (citation omitted). The Court concluded that the "reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's pri-

cal specimen to develop a DNA profile for criminal identification purposes is a reasonable search. Section 609.117, subdivision 1, does not allow the State to extract highly personal genetic information from the biological specimen taken; instead, the statute only allows the State to use the biological specimen to produce a DNA profile for criminal identification purposes, employing human genome locations that contain no genetic information. Moreover, there is no evidence that the State has or intends to use the biological specimens to extract highly personal genetic information. Thus, the dissent's argument is without merit.

vacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 118–19, 122 S.Ct. 587 (internal quotation marks omitted) (citation omitted). The Court reasoned that "probationers do not enjoy the absolute liberty to which every citizen is entitled. Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Id.* at 119, 122 S.Ct. 587 (internal quotation marks omitted) (citation omitted).

Similarly, in *Samson v. California*, the Court applied the totality-of-the-circumstances test to a suspicionless search of a parolee conducted pursuant to a California law, which provided that, as a condition for release, every prisoner eligible for state parole must agree to be subject to a search or seizure by a parole officer or other peace officer with or without a search warrant and with or without cause. 547 U.S. at 846, 848, 126 S.Ct. 2193. In doing so, the Court assessed " 'the degree to which [the search] intrude[d] upon an individual's privacy' " against " 'the degree to which [the search was] needed for the promotion of legitimate governmental interests.' " *Id.* at 848, 126 S.Ct. 2193 (quoting *Knights*, 534 U.S. at 118–19, 122 S.Ct. 587). In evaluating the degree of intrusion, the Court reaffirmed its holding in *Knights* that "by virtue of their status alone, probationers do not enjoy the absolute liberty to which every citizen is entitled." *Id.* at 848–49, 126 S.Ct. 2193 (citing *Knights*, 534 U.S.

at 119, 122 S.Ct. 587) (internal quotation marks omitted).

A majority of federal circuits have applied the *Knights–Samson* totality-of-the-circumstances test to address the reasonableness of warrantless, suspicionless searches under the Federal DNA Act, 42 U.S.C. § 14135a (2006). Currently, eight circuits have concluded these searches are not unreasonable and therefore do not violate the Fourth Amendment.[3]

■ In *State v. Bartylla*, we considered whether the collection of a convicted felon's DNA, as authorized by Minn.Stat. § 609.117 (2002), violated the prohibitions of the U.S. and Minnesota Constitutions against warrantless, suspicionless searches. 755 N.W.2d 8, 14, 18 (Minn. 2008). Bartylla was convicted of murder in the first degree for a homicide that had grown cold until a DNA sample collected from Bartylla three years later matched DNA collected during the murder investigation. *Id.* at 12. Applying the *Knights–Samson* totality-of-the-circumstances test, we concluded that "as a result of his felony burglary conviction, the warrantless, suspicionless taking of Bartylla's DNA pursuant to Minn.Stat. § 609.117 for purposes of placing his DNA profile into the state-mandated database did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures." *Id.* at 17. We reasoned that as an incarcerated felon, Bartylla had a lower expectation of privacy than a probationer, parolee, or conditional releasee, and the physical intrusion was "minimal." *Id.* at 17–18. On the other hand, the State's interests of

---

**3.** *See United States v. Weikert*, 504 F.3d 1, 11, 15 (1st Cir.2007) (applying the totality-of-the-circumstances test to analyze and uphold the Federal DNA Act); *United States v. Sczubelek*, 402 F.3d 175, 184 (3d Cir.2005) (same); *Groceman v. U.S. Dep't of Justice*, 354 F.3d 411, 413–14 (5th Cir.2004) (same); *United States v. Conley*, 453 F.3d 674, 679–81 (6th Cir.2006) (same); *United States v. Kraklio*, 451 F.3d 922, 924–25 (8th Cir.2006) (same); *United States v. Kincade*, 379 F.3d 813, 832, 839 (9th Cir.2004) (plurality opinion) (same); *Banks v. United States*, 490 F.3d 1178, 1193 (10th Cir.2007) (same); *Johnson v. Quander*, 440 F.3d 489, 496 (D.C.Cir.2006) (same).

"exonerating the innocent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure for victims of unsolved crimes" were substantial. *Id.* at 18. For the same reasons, we concluded the DNA collection authorized by section 609.117 did not violate Article I, Section 10 of the Minnesota Constitution.[4] *Id.* at 19. In doing so, we reasoned that the "totality-of-the-circumstances test we adopt today" provided adequate protections to Minnesota's citizens, and therefore we declined to interpret Article I, Section 10 more broadly than the Fourth Amendment.[5] *Id.* at 18–19.

■ The State admits that the taking of Johnson's biological specimen pursuant to section 609.117, subdivision 1(1), for criminal identification purposes constitutes a search within the meaning of the U.S. and Minnesota Constitutions.[6] *See Bartylla,* 755 N.W.2d at 14 (analyzing DNA collection pursuant to section 609.117 as a Fourth Amendment search); *see also Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 618, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (concluding the collection of biological specimens is a Fourth Amendment search). Consequently, the question we must examine is the reasonableness of the search in this case.

The taking of DNA samples for identification purposes implicates two privacy interests: (1) an expectation of privacy in one's bodily integrity, and (2) an expecta-

4. According to the dissent, the statutory DNA collection procedure is a "full-scale personal DNA search[]" that exposes "exceptionally private information" to public view, including a "person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct." We disagree. Section 609.117, subdivision 1(1), authorizes the collection of DNA samples from a narrowly defined set of individuals convicted of a misdemeanor arising out of the same set of circumstances that provided probable cause for a felony charge. The governmental use of the data is to determine a DNA profile for the limited purpose of criminal identification. Further, access to the information is restricted to law enforcement officers conducting criminal investigations. In summary, nothing in Minn.Stat. § 609.117, subd. 1, authorizes a full-scale personal DNA search that exposes "exceptionally private information" to public view, including a "person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct." Rather, Minn.Stat. § 299C.155 limits the use of the DNA profile to criminal identification. Specifically, subdivisions 3 and 4 provide that the DNA profile may be used only for criminal identification purposes. *Id.,* subds. 3, 4.

5. One commentator has criticized the *Knights–Samson* totality-of-the-circumstances test. *See* 5 Wayne R. LaFave, *Search & Seizure,* § 10.10(c) (4th ed.2004). But LaFave's criticisms of the *Knights–Samson* test would apply equally to felony and misdemeanor cases. In *Bartylla,* which was decided four years after LaFave's criticism, we adopted the *Knights–Samson* totality-of-the-circumstances test, and applied the test to a felony case. Pursuant to the doctrine of stare decisis, we do not overrule prior decisions absent a compelling reason. *State v. Martin,* 773 N.W.2d 89, 98 (Minn.2009). No compelling reason has been asserted to overturn *Bartylla,* and therefore we apply the *Knights–Samson* test in this case.

6. At oral argument, Johnson argued that a search subject to Fourth Amendment protection occurs each time the DNA database is accessed by law enforcement. Johnson has not previously raised this argument in either the district court or the court of appeals, and therefore we decline to address it now. *State v. Spence,* 768 N.W.2d 104, 110 n. 6 (Minn. 2009) (declining to address an issue raised for the first time on appeal). We do note, however, that at least one federal court has held that "the process of matching one piece of personal information against government records does not implicate the Fourth Amendment." *Johnson,* 440 F.3d at 498. Moreover, the consequences of a conclusion to the contrary would place an enormous burden on law enforcement because every search of a fingerprint or DNA database would be subject to Fourth Amendment challenge. *See id.* at 499.

tion of privacy in one's identity. *See United States v. Kriesel*, 508 F.3d 941, 946–48 (9th Cir.2007); *United States v. Amerson*, 483 F.3d 73, 84–85 (2d Cir.2007) (*cited in Bartylla*, 755 N.W.2d at 16–17); *see also Skinner*, 489 U.S. at 617, 109 S.Ct. 1402 (explaining that the collection of urine intrudes on expectations of privacy that society has long recognized as reasonable because there are few activities in society more private than the passing of urine; most people describe it by euphemisms if they talk about it at all); *cf.* Minn.Stat. § 299C.155, subd. 3 (providing that DNA data contained in the centralized database is "private data on individuals"). We implicitly recognized these two privacy interests in *Bartylla* when we noted that "the physical intrusion involved in acquiring the DNA sample from Bartylla for purposes of identification was minimal." 755 N.W.2d at 18 n. 6. We emphasized in *Bartylla* that we need not and did not consider whether "an intrusion into Bartylla's body to obtain DNA for purposes other than identification [would] be minimal or [would] violate the Fourth Amendment" because those questions were not presented by the DNA sample collection in Bartylla's case.[7] *Id.*

Johnson argues *Bartylla* applies only to the DNA samples taken from defendants convicted of a felony and incarcerated, who have "severely diminished privacy expectations." Thus, he argues that we should not extend *Bartylla* beyond those defendants convicted of a felony. In *Bartylla* we adopted the *Knights–Samson* totality-of-the-circumstances test to determine whether a particular search is reasonable. Consequently, we must examine the nature of the physical intrusion on Johnson's bodily integrity, and Johnson's reasonable expectation of privacy in his identity. *See Bartylla*, 755 N.W.2d at 17–18; *see also Amerson*, 483 F.3d at 84–85.

Here, the prosecutor determined that there was probable cause to charge Johnson with felony domestic assault by strangulation, in violation of Minn.Stat. § 609.2247, subd. 2, and the district court signed the complaint, concluding that there was probable cause to charge Johnson.[8] The district court released Johnson on several probationary conditions, including no use of alcohol, random urinalysis, and no contact with the victim.[9] When Johnson

---

7. As discussed in more detail below, Johnson's and Bartylla's DNA samples were collected for the same limited purpose—identification. We do not consider whether an intrusion into Johnson's body to obtain DNA for purposes other than identification would violate the Fourth Amendment.

8. A felony charge can be prosecuted only by complaint or indictment. *See* Minn. R.Crim. P. 17.01. Moreover, a complaint cannot be issued without a prosecutor's signature, and a judge must make a determination that probable cause exists. Minn. R.Crim. P. 2.01, 2.02; *see State v. Lopez*, 778 N.W.2d 700, 703 (Minn.2010) ("A person may be charged with a crime only where there is probable cause to believe that the person is guilty. . . .").

9. Johnson argues that the dismissed felony charge is irrelevant to the analysis. We disagree. Pursuant to Minn. R.Crim. P. 6.02, the district court properly considered the seri-

ous nature of the felony charge when the court ordered conditions of release, including random urinalysis, which lowered Johnson's expectation of privacy. Johnson has not argued that the felony charge should have been dismissed for lack of probable cause, nor has he challenged the conditional release terms imposed by the district court. The temporary reduction in Johnson's expectation of privacy caused by the lawful pretrial conditions might not have been sufficient in itself to warrant the collection of a DNA sample. *See In re the Welfare of C.T.L.*, 722 N.W.2d 484, 491 (Minn. App.2006). But it does not follow that the pretrial reduction of Johnson's expectation of privacy is irrelevant to the *Samson* totality-of-the-circumstances test, especially when the pretrial reduction of Johnson's expectation of privacy became a long-term probationary condition of the misdemeanor conviction that arose out of the same set of circumstances as the felony charge.

pleaded guilty to the lesser-included offense of misdemeanor fifth-degree domestic assault arising out of the same set of circumstances as the felony domestic assault by strangulation charge, the district court ordered that Johnson continue to submit to random urinalysis, complete domestic abuse treatment, and have no contact with the victim as part of his two-year probationary term.[10]

We conclude that the physical intrusion of Johnson's bodily integrity to acquire the DNA sample is minimal, especially when compared to the other intrusions Johnson is subjected to as part of his probation, including random urinalysis. Moreover, the physical intrusion of Johnson's bodily integrity—a buccal swab inside Johnson's cheek—is no greater than the intrusion in *Bartylla*, which we held constituted a minimal intrusion. *Bartylla*, 755 N.W.2d at 18.

■ We next examine whether Johnson had a reasonable expectation of privacy in his identity. We have recognized that there is a hierarchy of expectations of privacy, such that incarcerated prisoners have less of a privacy expectation than probationers, parolees, or conditional re-

leasees. *Id.* at 17; *State v. Anderson*, 733 N.W.2d 128, 139 (Minn.2007) (concluding that a defendant's "reasonable expectation of privacy was diminished merely by virtue of his status as a probationer"). In *Amerson*, 483 F.3d at 86, the Second Circuit concluded that "a probationer's expectation of privacy in his or her identity is severely diminished." Like the court in *Amerson*, we conclude that Johnson's status as a probationer significantly reduced his expectation of privacy *in his identity*.[11]

On the other side of the totality-of-the-circumstances analysis is "the degree to which [the DNA collection] is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848, 126 S.Ct. 2193. Here, the State's interests in DNA collection under section 609.117, subdivision 1(1), are the same interests addressed in *Bartylla*, which include "exonerating the innocent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure for victims of unsolved crimes." 755 N.W.2d at 18. These substantial interests apply equally whether the offender is convicted of a felony and incarcerated or is convicted of a misdemeanor arising out of the same set of

10. We note that, pursuant to Minn.Stat. § 609.2242, subd. 3(d) (2010), Johnson's misdemeanor conviction prohibits him from possessing a firearm for three years. This mandatory statutory restriction on firearm possession is another factor that supports a determination that the circumstances of Johnson's conviction reduced his expectation of privacy.

11. The dissent contends that Johnson's expectation of privacy in biological specimens containing his DNA is "essentially the same" as an "ordinary citizen." We disagree for several reasons. First, Johnson was charged with a felony and convicted of a misdemeanor arising out of the same set of circumstances. Thus, Johnson is no ordinary citizen. Additionally, Johnson was required as a condition of probation to submit to ongoing random urinalyses, which diminishes his expectation

of privacy. *See Skinner*, 489 U.S. at 617, 109 S.Ct. 1402 ("[T]he collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable. . . ."). It is unreasonable to suggest that a person retains an ordinary citizen's "high expectation of privacy in his or her DNA," when the person's expectation of privacy has been reduced by the conditions of his probation, including suspicionless analysis of his urine (which contains his DNA). There is no material distinction between random urinalysis, which is used to determine whether the person is using alcohol or drugs, and a DNA profile, which is used to determine whether the person left DNA at a crime scene. In both situations, the government collects a biological specimen that is used by a restricted number of persons for a limited and legitimate governmental interest.

circumstances as a felony charge and placed on probation.[12] Balancing the State's legitimate governmental interests in DNA collection against Johnson's reduced expectation of privacy in his identity, we conclude that, as applied here, the statutorily-mandated collection of Johnson's DNA for criminal identification purposes pursuant to section 609.117, subdivision 1(1), does not violate the U.S. or Minnesota Constitutions.

Johnson argues *In re the Welfare of C.T.L.*, 722 N.W.2d 484 (Minn.App.2006), supports his argument that only a felony conviction would satisfy the totality-of-the-circumstances analysis. But *C.T.L.* involved individuals charged but not yet convicted of a crime, and therefore is distinguishable. The portions of Minn.Stat. § 299C.105 (2010) at issue in *C.T.L.* applied only to DNA collection from juveniles and adults charged with specific felonies, and did not require a conviction prior to collecting DNA. *C.T.L.*, 722 N.W.2d at 488. The court of appeals concluded that the DNA collection was unreasonable under the totality-of-the-circumstances test because a charged individual does not have the same diminished expectation of privacy as a convicted individual, and therefore the State's interests did not outweigh the expectation of privacy of an individual prior to conviction. *Id.* at 491–92. Johnson, however, has been convicted of a misdemeanor arising out of the same set of circumstances as a felony charge, and therefore his situation is distinguishable

from individuals who have been charged but not convicted of any offense.

Johnson also argues that decisions from other state courts support his conclusion that a felony conviction is required before DNA may be collected without a warrant. The two cases upon which Johnson relies are easily distinguishable. In *State v. McKinney*, the Nebraska Supreme Court analyzed the reasonableness of a statute allowing the collection of DNA samples from individuals for use in a specific investigation, and concluded that the government's interest in taking DNA for investigation of a particular crime did not outweigh a defendant's privacy interest. 273 Neb. 346, 730 N.W.2d 74, 83, 86 (2007). The differences in the purposes of the Minnesota and Nebraska statutes, however, significantly change the totality-of-the-circumstances analysis. Specifically, Minn.Stat. § 609.117, subd. 1(1), requires collection from an entire category of offenders for inclusion in a DNA database. Also, in *Quarterman v. State*, the Georgia Supreme Court addressed whether a statute requiring DNA collection from felons but not from misdemeanants violated equal protection. 282 Ga. 383, 651 S.E.2d 32, 34 (2007). The reduced expectation of privacy for misdemeanants was not at issue in *Quarterman*; rather, the only question was whether a rational distinction could be made between felons and misdemeanants. *Id.* at 34.

Moreover, other jurisdictions have not uniformly limited DNA collection to felony convictions.[13] Specifically, state courts

---

12. The dissent contends that the State failed to prove that DNA collection was necessary to promote legitimate State interests. But Johnson did not challenge the State's assertion that its interests in DNA collection were the same as in *Bartylla*—"exonerating the innocent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure for victims of unsolved crimes."

Rather, Johnson argued that his privacy interest outweighs the State's interests.

13. *See* Me.Rev.Stat. Ann. tit. 25, § 1574(4)(N), 5(H) (2007) (requiring DNA collection from every person convicted of "[a]ny lesser included offense" of any charged qualifying crime); N.J. Stat. Ann. § 53:1–20.20g (West 2010) ("[E]very person convicted ... of a crime shall have a blood sample drawn or

have not adopted a bright-line rule excluding DNA collection from individuals with a misdemeanor conviction. Rather, the courts have applied a totality-of-the-circumstances test to the facts of each case.

In summary, we conclude that when a person is convicted of a misdemeanor offense that arises out of the same set of circumstances as a felony charge and that person's sentence includes probation with conditions such as random urinalyses, there is a significant reduction in that person's expectation of privacy in his or her identity. Additionally, the State's interests in exonerating the innocent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure to victims of unsolved crimes are substantial. Applying the totality-of-the-circumstances test to the facts of this case, we conclude that DNA collection by buccal swab for identification purposes is not an unreasonable search. Accordingly, we conclude that the statutorily-mandated collection of Johnson's DNA pursuant to section 609.117, subdivision 1(1), does not constitute an unreasonable search or seizure under the U.S. or Minnesota Constitutions.

## II.

Johnson argues that Minn.Stat. § 609.117, subd. 1(1), deprives him of his right to equal protection of the laws in violation of the U.S. and Minnesota Constitutions. Specifically, he contends that the statute is unconstitutional because it requires a defendant charged with a felony and then convicted of a misdemeanor arising out of the same set of circumstances to provide a DNA sample, but does not require a DNA sample from defendants convicted of a misdemeanor but not charged with a felony. The State counters that these two categories of defendants are not similarly situated, and thus no equal protection violation exists.

■ The constitutionality of a statute presents a question of law that we review de novo. *State v. Melde,* 725 N.W.2d 99, 102 (Minn.2006). In the equal protection context, we presume Minnesota statutes are constitutional when they do not involve a fundamental right or a suspect class. *See State v. Benniefield,* 678 N.W.2d 42, 45 (Minn.2004). The party challenging the constitutionality of a statute bears "the very heavy burden of demonstrating beyond a reasonable doubt that the statute is unconstitutional." *State v. Behl,* 564 N.W.2d 560, 566 (Minn.1997).

The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." Article I, Section 2 of the Minnesota Constitution provides that "[n]o member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." We have previously concluded "[b]oth clauses have been analyzed under the same principles." *Kolton v. Cnty. of Anoka,* 645

other biological sample collected for purposes of DNA testing."); Tex. Gov't Code Ann. § 411.1471 (West 2005) (requiring DNA collection from a defendant who is "indicted or waives indictment" for specific felony offenses); *see also United States v. Pool,* 645 F.Supp.2d 903, 906 (E.D.Cal.2009) (holding that no constitutional violation exists when a DNA sample is collected after a probable cause determination pursuant to Federal DNA Act); *State v. O'Hagen,* 189 N.J. 140, 914 A.2d 267, 270–71 (2007) (upholding constitutionality of a statute requiring DNA collection from "[e]very person convicted or found not guilty by reason of insanity of a crime"); *Anderson v. Commonwealth,* 274 Va. 469, 650 S.E.2d 702, 706 (2007) (upholding the constitutionality of a statute requiring DNA collection upon arrest for specific crimes rather than upon conviction).

N.W.2d 403, 411 (Minn.2002). Specifically, the "Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); *see also Behl*, 564 N.W.2d at 568 (stating that equal protection "does not require the state to treat things that are different in fact or opinion as though they were the same in law").

■ Our precedent establishes different tests for rational basis review. First, the "similarly situated" test states that a statute violates equal protection when it "prescribes different punishments or different degrees of punishment for the same conduct committed under the same circumstances by persons similarly situated." *State v. Frazier*, 649 N.W.2d 828, 837 (Minn.2002). Additionally, we have applied the three-prong *Russell* test to equal protection claims. *Benniefield*, 678 N.W.2d at 46.

■ The threshold question in an equal protection claim is whether the claimant is treated differently from others to whom the claimant is similarly situated in all relevant respects. *State v. Cox*, 798 N.W.2d 517, 521–22 (Minn.2011). We impose this threshold showing because the Equal Protection Clause does not require that the State treat persons who are differently situated as though they were the same. *Id.* at 521. Here, Johnson has not made this showing. Johnson, as a misdemeanant with a dismissed felony charge, is not similarly situated to a misdemeanant who has not been charged with a felony. Specifically, Johnson was charged with felony domestic assault by strangulation and misdemeanor fifth-degree assault. The complaint was signed by the prosecutor and a judge determined that the complaint was supported by probable cause. *See*

Minn. R.Crim. P. 2.01. While the felony charge was dismissed as part of the plea agreement, the felony charge supports the conclusion that this conduct was more serious than conduct supporting only a misdemeanor charge. Objectively, Johnson's situation as a misdemeanant with a dismissed felony charge is factually different from that of a misdemeanant who has not been charged with a felony. Consequently, we conclude that Johnson is not similarly situated to misdemeanants without a felony charge, and therefore his equal protection claim fails.

Accordingly, we hold that section 609.117, subdivision 1(1) does not violate the Equal Protection Clauses of the U.S. or Minnesota Constitutions by requiring Johnson to submit a DNA sample for analysis.

Affirmed.

MEYER, Justice (dissenting).

I respectfully dissent. The collection of the biological specimen for DNA constitutes an intrusion upon personal security and dignity. The search of the DNA implicates strong privacy interests apart from those intruded upon by the collection of the specimen. Given the potential for exposure of exceptionally private information contained in the DNA, I find these full-scale personal DNA searches highly intrusive. The State claims that the collection and retention of biological specimens from misdemeanants for DNA serves the same interests as the collection and retention of specimens from felony offenders. But the State has not substantiated these claims. I would conclude that the State's interest in taking a biological specimen from a person convicted of only a misdemeanor for DNA profiling

and retention, without probable cause, does not outweigh the misdemeanant's privacy interests. I would hold that the DNA collection statute is unconstitutional as applied to a person convicted of only a misdemeanor.

## I.

Randolph Johnson, Jr., was charged with felony domestic assault (strangulation), Minn.Stat. § 609.2247, subd. 2 (2010), and fifth-degree misdemeanor assault (harm), Minn.Stat. § 609.224, subd. 1(2) (2010), arising out of an incident with his wife in his home. Johnson pleaded guilty to misdemeanor domestic assault (fear), Minn.Stat. § 609.2242, subd. 1(1) (2010). Johnson admitted to raising his voice to his wife in a manner that may have put her in fear of imminent bodily harm. The court sentenced Johnson to a 90–day stayed sentence, with credit for four days already served, and placed him on supervised probation. Pursuant to Minn.Stat. § 609.117, subd. 1(1) (2010), which requires collection of a DNA sample from any person charged with a felony offense and convicted of "any offense arising out of the same set of circumstances" as the felony charge, the court also ordered that Johnson provide a DNA sample but stayed that order pending the result of an appeal.

Johnson appealed, arguing that the application of Minn.Stat. § 609.117, subd. 1(1), to a person who was not convicted of a felony violates (1) his right to be free from unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and Article I, Section 10, of the Minnesota Constitution; and (2) his right to equal protection under the Fourteenth Amendment to the U.S. Constitution and Article I, Section 2, of the Minnesota Constitution. The court of appeals affirmed the decision of the district court.

Minnesota Statutes § 609.117, subd. 1(1), requires "a person charged with committing or attempting to commit a felony offense and ... convicted of that offense or of any offense arising out of the same set of circumstances" to provide a DNA sample for inclusion in a database maintained by the Bureau of Criminal Apprehension (BCA). The BCA database is a "centralized system to cross-reference data obtained from DNA analysis." Minn.Stat. § 299C.155, subd. 3 (2010). The database can be used to generate investigative leads by matching DNA profiles from samples collected at a crime scene to known profiles in the DNA database. *State v. Bartylla*, 755 N.W.2d 8, 12 n. 1 (Minn.2008). When this process results in the identification of a previously unknown suspect, it is called a "cold hit." *Id.*

Johnson challenges the constitutionality of Minn.Stat. § 609.117, subd. 1(1), arguing that the statute authorizes an unreasonable warrantless, suspicionless search in violation of the Fourth Amendment to the U.S. Constitution and Article I, Section 10, of the Minnesota Constitution. The State argues that the statute is constitutional because the factors on which we relied in *Bartylla* to uphold the collection of biological specimens for DNA from convicted, incarcerated felony offenders also apply to misdemeanants.

## II.

The constitutionality of a statute is a question of law, which we review de novo. *Hamilton v. Comm'r of Pub. Safety*, 600 N.W.2d 720, 722 (Minn.1999). We presume that statutes are constitutional and will strike down a statute "with extreme caution and only when absolutely necessary." *Id.* The party challenging the statute has the burden of showing that the statute is unconstitutional beyond a rea-

sonable doubt. *State v. Merrill,* 450 N.W.2d 318, 321 (Minn.1990).

The Fourth Amendment to the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[1] "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 613–14, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The collection and analysis of a DNA sample through either a blood draw or a buccal swab is a search. *See Skinner,* 489 U.S. at 616, 109 S.Ct. 1402 (noting that analysis of blood reveals private facts); *United States v. Amerson,* 483 F.3d 73, 77 (2d Cir.2007) ("[T]he extraction and analysis of plaintiffs' blood for DNA-indexing purposes constitute[s] a search . . . ." (quoting *Nicholas v. Goord,* 430 F.3d 652, 658 (2d Cir.2005))); *Bartylla,* 755 N.W.2d at 14.

To place the current debate in perspective, a brief tour of Fourth Amendment history is required. Under the Fourth Amendment, "a search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Established exceptions to the warrant requirement include searches incident to lawful arrest, *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), searches conducted pursuant to probable cause and exigent circumstances, *Chambers v. Maroney,* 399 U.S. 42, 51–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), searches conducted after obtaining voluntary consent, *Schneckloth,* 412 U.S. at 219, 93 S.Ct. 2041, stop and frisk, *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and administrative/regulatory "special needs searches," *Camara v. Municipal Court,* 387 U.S. 523, 537, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

The special needs exception applies "in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring). In *Camara,* the Supreme Court found that code enforcement housing inspections would satisfy constitutional concerns "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." 387 U.S. at 538, 87 S.Ct. 1727. The Court determined reasonableness "by balancing the need to search against the invasion which the search entails." *Id.* at 537, 87 S.Ct. 1727. The Court considered several factors, including that inspection schemes were likely the only effective means to gain compliance with minimal code standards and the "limited invasion of the urban citizen's privacy." *Id.* at 537, 87 S.Ct. 1727.

The *Camara* balancing test has been used in circumstances in which the government's need concerned the interest in

---

1. Article I, Section 10, of the Minnesota Constitution uses identical language.

maintaining the regulatory scheme. *E.g.*, *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (balancing government's need for sobriety checkpoints system to eradicate drunk driving against degree of intrusion upon briefly stopped motorists); *Skinner*, 489 U.S. at 620–24, 109 S.Ct. 1402 (balancing need for mandatory drug and alcohol testing scheme to ensure safety of traveling public against privacy interests of covered railroad employees); *T.L.O.*, 469 U.S. at 338–41, 105 S.Ct. 733 (Blackmun, J., concurring) (balancing schoolchildren's privacy interest against school's interest in maintaining discipline).

In *Griffin v. Wisconsin*, the Supreme Court used the special needs exception in upholding a warrantless search of a probationer's home pursuant to Wisconsin's search regulation and "reasonable grounds" to believe that contraband was present. 483 U.S. 868, 875–76, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). The Court balanced the special needs of the probation system and practicality of the warrant and probable-cause requirements against "the effect of dispensing with a warrant upon the probationer." *Id.* at 896, 107 S.Ct. 3164. The Court observed that "[a] State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Id.* at 873–74, 107 S.Ct. 3164. The Court believed that "[a] warrant requirement would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires." *Id.* at 876, 107 S.Ct. 3164. The Court focused on the probationer-probation officer relationship, noting that "[a]lthough a probation officer is not an impartial magistrate, neither is he the police officer who normally conducts searches against the ordinary citizen." *Id.* The probation officer, "while assuredly charged with protecting the public interest, is also supposed to have in mind the welfare of the probationer," called a "client" in the applicable regulations. *Id.*

The Court returned to probation searches in *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Knights was sentenced in state court to summary probation for a drug offense. *Id.* at 114, 122 S.Ct. 587. The probation order included the condition that Knights would "[s]ubmit his ... person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id.* Several days later, a sheriff's detective, aware of the search condition in the probation order, conducted a warrantless search of Knights' apartment on reasonable suspicion of arson. *Id.* at 115–16, 122 S.Ct. 587. Knights was indicted in federal court on several charges, but the evidence obtained in the search of his apartment was suppressed "on the ground that the search was for 'investigatory' rather than 'probationary' purposes." *Id.* at 116, 122 S.Ct. 587. The Court of Appeals for the Ninth Circuit affirmed. *Id.*

The Supreme Court reversed, rejecting Knights' view that *Griffin* controlled, and declining to decide whether the search condition constituted valid consent. *Id.* at 117–18, 122, 122 S.Ct. 587. Instead, the Court upheld the search under a new "general Fourth Amendment approach of 'examining the totality of the circumstances' " and determining the reasonableness of the search " 'by assessing, on the one hand, the degree to which it intrudes

upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Knights*, 534 U.S. at 118–19, 122 S.Ct. 587 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999); *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)).[2]

On the interest of privacy, the Court found that where the "probation order clearly expressed the search condition," and that "Knights was unambiguously informed of it," the probation condition "significantly diminished Knights' reasonable expectation of privacy." *Id.* at 119–20, 122 S.Ct. 587. On the governmental interest side, citing statistics, the Court found that because "[t]he recidivism rate of probationers is significantly higher than the general crime rate" and "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal," the state's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 120–21, 122 S.Ct. 587.

The Court held "that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." *Id.* at 121, 122 S.Ct. 587. The Court explained that "[w]hen an officer has reasonable suspicion

that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* The Court declined to "decide whether the probation condition so diminished, or completely eliminated, Knights' reasonable expectation of privacy . . . that a search by a law enforcement officer without any individualized suspicion would have satisfied . . . the Fourth Amendment." *Id.* at 120 n. 6, 117 S.Ct. 417.

The Court answered that question in *Samson v. California*, holding that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." 547 U.S. 843, 857, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). In *Samson*, the search was authorized by a statute providing, in relevant part, "that every prisoner eligible for release on state parole 'shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause.'" *Id.* at 846, 126 S.Ct. 2193 (quoting Cal.Penal Code § 3067(a) (West 2000)).

On September 6, 2002, Samson, a parolee, was walking down a street with a friend and her three-year-old child. Samson was stopped by a police officer who knew Samson was on parole. *Id.* at 846, 126 S.Ct. 2193. The officer searched Sam-

---

**2.** The '"totality of the circumstances" had generally been associated with the validity of a consent search or probable cause. *See Robinette*, 519 U.S. at 39–40, 117 S.Ct. 417 (stating that reasonableness of a search "is measured in objective terms by examining the totality of the circumstances" and that "[t]he Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circum-

stances.'" (quoting *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. 2041)); *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (explaining that the "totality-of-the-circumstances analysis . . . traditionally has informed probable-cause determinations"). "The test [had] never been used, however, to justify suspicionless law enforcement searches." *United States v. Kincade*, 379 F.3d 813, 862 (9th Cir.2004) (Reinhardt, J., dissenting).

son based solely on Samson's parolee status. *Id.* at 846–47, 126 S.Ct. 2193. The officer found a cigarette box in Samson's pocket. *Id.* at 847, 126 S.Ct. 2193. "Inside the box he found a plastic baggie containing methamphetamine." *Id.*

In determining the validity of the search, the Court used the new *Knights* totality-of-the-circumstances balancing test, starting with Samson's "status as a parolee, 'an established variation on imprisonment,'" and the probation search condition under California law, which had been "'clearly expressed'" to Samson. *Id.* at 852, 126 S.Ct. 2193 (quoting *Knights,* 534 U.S. at 119, 122 S.Ct. 587; *Morrissey v. Brewer,* 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). The Court concluded that Samson "did not have an expectation of privacy that society would recognize as legitimate." *Id.* "The State's interests," the Court found, were "substantial." *Id.* at 853, 126 S.Ct. 2193. The "State has an 'overwhelming interest' in supervising parolees because 'parolees ... are more likely to commit future criminal offenses.'" *Id.* (quoting *Pa. Bd. of Prob. & Parole v. Scott,* 524 U.S. 357, 365, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)). The Court held that "California's ability to conduct suspicionless searches of parolees serves its interest in reducing recidivism, in a manner that aids, rather than hinders, the reintegration of parolees into productive society." *Id.* at 854, 126 S.Ct. 2193.

Justice Stevens, joined by Justices Souter and Breyer, dissented, noting that case precedent "consistently assumed that the Fourth Amendment provides some degree of protection for probationers and parolees," and asserting that "neither *Knights* nor *Griffin* supports a regime of suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards, by law enforcement personnel who have no special interest in the welfare of the parolee or probationer." *Id.* at 857, 126 S.Ct. 2193 (Stevens, J., dissenting). The dissent pointed out that "the majority [did] not seek to justify the search of petitioner on 'special needs' grounds. Although the Court has in the past relied on special needs to uphold warrantless searches of probationers, it has never gone so far as to hold that a probationer or parolee may be subjected to full search at the whim of any law enforcement officer he happens to encounter, whether or not the officer has reason to suspect him of wrongdoing." *Id.* at 858–59, 126 S.Ct. 2193 (citation omitted).

The *Knights–Samson* balancing approach has prompted much concern:

> Because *Knights* purports to be utilizing "our general Fourth Amendment approach" and *not* a "special need" analysis, it can only be assumed that what the Court has to say in *Knights* has more general application as to the Court's interpretation of the Fourth Amendment in other cases in which the basic question is, as in *Knights,* whether the two fundamental protections of the Amendment—the warrant and probable cause requirements—are applicable. The mere suggestion that these protections might be balanced away in a great variety of circumstances is troubling enough in and of itself, but once it is seen what the Court deemed appropriate in *Knights* to place in the balance, there is even greater cause for concern.

5 Wayne R. LaFave, *Search & Seizure,* § 10.10(c) (4th ed.2004). Professor LaFave finds the "move from a 'special needs' analysis" in *Griffin* "to a less-restrained 'totality of the circumstances' balancing" in *Knights* and *Samson* "especially trouble-

some." *Id.* § 10.10 (Supp.2011–2012).[3] The Iowa Supreme Court rejected *Samson* as a sharp departure from prior Court decisions and decided the validity of a warrantless search of a parolee's motel room under its own constitution. *State v. Ochoa*, 792 N.W.2d 260, 287–91 (Iowa 2010).

*Suspicionless Search Programs.* In finding suspicionless-search programs created by state and federal DNA indexing laws constitutional under the Fourth Amendment, the majority of federal courts have relied on the *Knights–Samson* "totality of the circumstances" balancing test. *United States v. Kraklio*, 451 F.3d 922, 924 (8th Cir.2006) (citing cases). A minority of federal courts, however, have applied the "special needs" test, examining whether special needs exist that sufficiently justify a search absent a warrant and probable cause. *Id.* In *Bartylla*, we adopted the

*Knights–Samson* totality-of-the-circumstances approach in ruling on the constitutionality of Minn.Stat. § 609.117 and declined to interpret Article 1, Section 10 of the Minnesota Constitution more broadly than the Fourth Amendment. *State v. Bartylla*, 755 N.W.2d 8, 17–19 (Minn.2008). *Bartylla* involved the application of the statute to the DNA analysis of a biological specimen apparently collected after Bartylla's felony conviction of burglary. *Id.* at 12 n. 2. We upheld the statute based on two important factors—the felony conviction and Bartylla's status as an incarcerated felon: "An incarcerated prisoner such as Bartylla has an even lower expectation of privacy than does a probationer, parolee, or conditional releasee." *Id.* at 17. We also noted that "[t]he question of whether we would apply Minn.Stat. § 609.117 (2006) to nonfelonies is not before us." *Id.* at 12 n. 2.[4]

---

**3.** *See also* John D. Castiglione, Hudson and Samson: *The Roberts Court Confronts Privacy, Dignity, and the Fourth Amendment*, 68 La. L.Rev. 63, 105 (2007) ("[T]he [*Samson*] Court's rather cavalier assumption that the government's interest in supervising parolees overrides the interest of the parolee to be searched only when there is reason to believe some sort of criminal conduct is afoot is disturbing. This is especially true given the fact that the majority's opinion fails to argue compellingly that such suspicionless searches actually serve the penological, rehabilitative, and reintegrationist goals of parole."); David A. Moran, *The End of the Exclusionary Rule, Among Other Things: The Roberts Court Takes on the Fourth Amendment*, 2006 Cato Sup.Ct. Rev. 283, 295 (arguing that "[t]he effect of *Samson* is indeed sweeping," leading to " 'an unprecedented curtailment of liberty' for nearly a million of our fellow citizens," (quoting *Samson*, 547 U.S. at 857, 126 S.Ct. 2193 (Stevens, J., dissenting))); Christian Antkowiak, Recent Decision, *Parolee's Reduced Expectation of Privacy May Justify Suspicionless Search:* Samson v. California, 45 Duq. L.Rev. 311, 323 (2007) ("[T]he broader debate taking place in *Samson* ... is not a question of whether suspicionless searches of a parolee are reasonable or justifiable; rather, the issue

is whether and to what extent the government may serve a public interest at the expense of constitutional rights."); Robert Cacace, Recent Development, Samson v. California: *Tearing Down a Pillar of Fourth Amendment Protections*, 42 Harv. C.R.-C.L. L.Rev. 223, 237 (2007) ("As the DNA cases make clear, courts are eager to extend *Samson*'s logic along the continuum toward law-abiding citizens."); Antoine McNamara, Note, *The "Special Needs" of Prison, Probation, and Parole*, 82 N.Y.U. L.Rev. 209, 239 (2007) (arguing that the *Knights–Samson* balancing framework "takes into account impermissible factors and explicitly discounts the privacy interests at stake").

**4.** Prior to *Bartylla,* we applied the *Knights* balancing test to a probation officer's warrantless search of a felon's home based on reasonable suspicion of criminal activity and a search condition in the probation agreement. *State v. Anderson*, 733 N.W.2d 128, 138–39 (Minn.2007). There, we discussed the special needs of the probationer-probation officer relationship recognized in *Griffin*, 483 U.S. at 868, 107 S.Ct. 3164, and *State v. Earnest*, 293 N.W.2d 365, 368 (Minn.1980). *Anderson*, 733 N.W.2d at 136–37.

## III.

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).[5] The Supreme Court has recognized that " '[t]he security of one's privacy against arbitrary intrusion by the police' " is " 'at the core of the Fourth Amendment' " and " 'basic to a free society.' " *Id.* (quoting *Wolf v. Colorado,* 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)). The Court "reaffirmed that broad view of the Amendment's purpose in applying the federal exclusionary rule to the States in *Mapp.*" *Id.*

In assessing the privacy interest in this case, we should first examine the extent to which compelled collection of a person's DNA would intrude upon the privacy of an ordinary citizen not charged with any crime. That requires consideration of both the method of the intrusion and the person's expectation of privacy in his or her DNA. *See Bartylla,* 755 N.W.2d at 17–18. We should then determine the extent to which the privacy interest is reduced when that person has been charged with a felony and convicted of a misdemeanor. Finally, we should analyze and balance the privacy interest at stake against the extent to which DNA collection and analysis promote legitimate government interests.

### A.

I begin with analyzing the extent to which suspicionless collection of a person's DNA would intrude upon the privacy of an ordinary Minnesota citizen. "[T]he Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In *Bartylla,* we talked about only the physical intrusion in obtaining DNA and not about the analysis of DNA itself. 755 N.W.2d at 18. An analysis of the DNA itself implicates strong privacy interests apart from those intruded upon by the collection of the sample. *See Skinner,* 489 U.S. at 616, 109 S.Ct. 1402 ("The ensuing chemical analysis of the [blood] sample to obtain physiological data is a further invasion of the tested employee's privacy interests.").

The inquiry into the constitutionality of collecting DNA samples from convicted offenders should not stop at the moment of collection. Rather, we need to consider " 'the nature of the privacy interest upon which the search here at issue intrudes' and the degree to which the intrusion affects this interest." *In re the Welfare of M.L.M.,* 813 N.W.2d 26, 42 (Minn.2012) (Meyer, J., dissenting) (quoting *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)). "[I]n assessing privacy interests implicated in the collection and retention of a DNA

---

5. Despite what appears to be a welter of different conceptions of privacy, [Professor Solove] argue[s] that they can be dealt with under six general headings ... (1) the right to be let alone ...; (2) limited access to the self—the ability to shield oneself from unwanted access by others; (3) secrecy—the concealment of certain matters from others;

(4) control over personal information ...; (5) personhood—the protection of one's personality, individuality, and dignity; and (6) intimacy—control over, or limited access to, one's intimate relationships or aspects of life.

Daniel J. Solove, *Conceptualizing Privacy,* 90 Cal. L.Rev. 1087, 1092 (2002).

sample from a person convicted of a misdemeanor, our concern should focus on the genetic information contained in the DNA sample and not on the identity function of the DNA profile." *Id.* at 48. It is the nature of this information that causes the greatest concern:

> An individual's DNA contains a wealth of information. Likewise, the noncoding regions used in DNA profiling "can indicate or predict disease states, and all loci, coding and noncoding alike, can be used for parentage testing." Concededly, the DNA profiles maintained in the CODIS database contain purely biometric identifiers that are "represented in the data base ... as a series of digits comparable to social security numbers or passport numbers." Privacy concerns, however, are implicated by the maintenance of DNA samples in a databank, much like a blood bank.

Tracey Maclin, *Is Obtaining an Arrestee's DNA a Valid Special Needs Search Under the Fourth Amendment? What Should (and Will) the Supreme Court Do?*, 34 J.L. Med. & Ethics 165, 169 (2006) (quoting David H. Kaye, Commentary, *Two Fallacies About DNA Data Banks for Law Enforcement*, 67 Brook. L.Rev. 179, 187, 192 (2001)).

To understand the privacy implications of the collection and indexing of a person's DNA profile into a centralized database, we need a basic understanding of both DNA itself and the process by which a biological specimen is taken and the DNA profile generated. The human body contains several trillion cells. Nat'l Inst. of Justice, *The Future of Forensic DNA Testing* 8 (2000) (hereinafter NIJ). Each cell contains 23 pairs of microscopic bodies called chromosomes. *Id.* at 8–10. The core of a chromosome is a long thread of deoxyribonucleic acid, more commonly known by the abbreviation DNA. *Id.* at 10.

DNA is made up of four nucleotides, called bases, abbreviated A, T, C, and G, that are repeated over and over in pairs: A always pairs with T, and C always pairs with G. *Id.* "The arrangement of base pairs in chromosomal DNA comprises the genetic code that differentiates humans from non-humans and makes every person unique." *United States v. Shea*, 957 F.Supp. 331, 333 (D.N.H.1997).

A gene is an area of DNA 1,000 to 100,000 or more base pairs in length that provides instructions on how to produce something—usually a protein. NIJ, *supra*, at 11. Genes make up only about 3% of human DNA. *Id.* at 12. The rest are known as "non-coding" DNA, or "junk DNA," because they have no known biological function. *Id.*

The set of all base pairs in all the pairs of chromosomes in a body cell is called a *genome. Id.* at 10. The human genome is six billion base pairs long. *Id.* No two people, other than identical twins, have the same DNA, but the vast majority of the human genome is the same from person to person. *Id.* DNA from two unrelated people will differ only in 1 out of 1,000 base pairs on average. *Id.*

DNA is often referred to as the "blueprint" for life. *See Shea*, 957 F.Supp. at 333. "DNA stores and reveals massive amounts of personal, private data about that individual," including information about that "person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct." *United States v. Kincade*, 379 F.3d 813, 842 n. 3 (9th Cir.2004) (Gould, J., concurring). Genetic information is not only "information about us," but also "information about our parents, our siblings, and our children." George J. Annas, *Genetic Privacy: There Ought to be a Law*, 4 Tex. Rev. L. & Pol. 9, 10 (1999). It has been described as a "reverse diary"

that "informs our younger selves about our aging selves." *Id.* at 11. DNA "can provide insights into personal family relationships, disease predisposition, physical attributes, and ancestry." Tania Simoncelli, *Dangerous Excursions: The Case Against Expanding Forensic DNA Databases to Innocent Persons,* 34 J.L. Med. & Ethics 390, 392 (2006). It has been suggested that future research might reveal a genetic "predisposition to such behavior as rage and violence." *See* Robert H. Bork, *The Challenges of Biology for Law,* 4 Tex. Rev. L. & Pol. 1, 2 (1999).

The significance of DNA—indeed, the only reason for collecting biological specimens for DNA—is the information it provides. Biological specimens obtained for DNA have the potential to reveal extremely personal information. *State v. Raines,* 383 Md. 1, 857 A.2d 19, 63 (2004) (Bell, C.J., dissenting) ("Unlike fingerprints, which contain all of the useable identifying information at the time the prints are taken, the DNA search does not end with the swab. To the contrary, the swab is then subjected to scientific tests, which may extract very sensitive, personal, and potentially humiliating information.").[6] Given the potential of DNA technology to expose extremely private information, I find these full-scale, personal DNA searches highly intrusive.

Minnesota's DNA collection statute recognizes that our citizens have a protected privacy interest in DNA information. Data contained in the DNA database is classified as private data under the Minnesota Government Data Practices Act. Minn.Stat. § 299C.155, subd. 3. To be sure,

the DNA collection process contains safeguards to protect privacy. The information stored in the DNA database is not the full DNA sequence, but a DNA profile—a set of numbers based on comparisons of the repetitions in thirteen "non-coding" locations on the human genome. But the fact that these regions are currently believed to contain no genetic information does not guarantee that they will never reveal traits. "Recent studies have begun to question the notion that junk DNA does not contain useful genetic programming material." *Kincade,* 379 F.3d at 818 n. 6 (plurality opinion). Indeed, it has already been suggested that "junk DNA" may contain information about " 'genetic defects, predispositions to diseases, and perhaps even sexual orientation.' " *Id.* at 850 (Reinhardt, J., dissenting) (quoting Harold J. Krent, *Of Diaries and Data Banks: Use Restrictions Under the Fourth Amendment,* 74 Tex. L.Rev. 49, 95–96 (1995)). These concerns are sometimes dismissed as needless worry about speculative future developments. But in genetics, a field in which new discoveries are continually and rapidly made, a complete evaluation of the privacy risks must take into account not only what we currently know, but what might be known in the future.

Furthermore, the statute's privacy protections are focused on DNA *profiles.* The biological specimens are far less controlled. The statute requires the BCA to "maintain, preserve, and analyze human *biological specimens* for DNA." Minn.Stat. § 299C.155, subd. 3 (emphasis added). In other words, the statute requires the BCA

---

6. The collection and retention of DNA in a centralized databank also "carries with it all of the dangers inherent in allowing the government to collect and store information about its citizens in a centralized place." *Kincade,* 379 F.3d at 843 (Reinhardt, J., dissenting) (citing use of centralized information in Hoover-era FBI to terrorize civil rights leaders, government surveillance and McCarthy-era interrogation of alleged communists and alleged communist-sympathizers, the Palmer Raids, and the roundup of Japanese Americans during World War Two).

to maintain not only the DNA profiles, but the biological specimens used to generate those profiles. A biological specimen contains far more information than a DNA profile. "[O]ne drop of blood.... is a complete record of your DNA." Annas, *supra*, at 10.

This highlights an important difference between collection of a biological specimen and indexing of a DNA profile under the DNA collection statute and the suspicionless collection of urine samples required as a condition of probation. Urine collected as a condition of probation is used only for the purpose of testing for specified substances. The sample is discarded or destroyed. A DNA profile, however, is not merely the result of a test, but is indexed into a database. The purpose of that database creates a strong incentive to retain the original biological specimens, which are available to perform more intrusive tests in the future.

In conclusion, a person's DNA deserves the same constitutional protection as other very private and sensitive information; the ordinary citizen in Minnesota has a high expectation of privacy in his or her DNA.

### B.

Turning to the question of whether a convicted misdemeanant has a reduced privacy interest that would subject him or her to a full-scale search of private DNA information, I would begin with the consensus that privacy interests in DNA information are clear. We would not and should not countenance compelled collection of biological specimens from the ordinary citizen.

The U.S. Supreme Court has said that probation is "one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Griffin*, 483 U.S. at 874, 107 S.Ct. 3164. "[D]ifferent options lie between those extremes, including confinement in a medium- or minimum-security facility, work-release programs, 'halfway houses,' and probation—which can itself be more or less confining depending upon the number and severity of restrictions imposed." *Id.*

Individuals incarcerated in prison are denied "[a] right of privacy in traditional Fourth Amendment terms." *Hudson v. Palmer*, 468 U.S. 517, 527, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (holding prisoners have no expectation of privacy in their prison cells). Parolees have a "substantially diminished expectation of privacy." *Samson*, 547 U.S. at 855, 126 S.Ct. 2193. The Court described parole as an "established variation on imprisonment." *Id.* at 850 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)) (internal quotation marks omitted). Parole and probation, however, are "two quite different subsets." *United States v. Crawford*, 372 F.3d 1048, 1076 (9th Cir.2004) (Kleinfeld, J. concurring).

Parolees are persons who have been sentenced to prison for felonies and released before the end of their prison terms.... The only way to get parole in the typical state system is to commit a felony, not merely a misdemeanor, and get sentenced to prison, not merely jail, for a period of time long enough to qualify for release, eventually, on parole. Thus, as distinguished from those not convicted of anything, those convicted of mere misdemeanors and either jailed or not jailed, and those convicted of felonies but not imprisoned for lengthy periods, parolees are persons deemed to have acted more harmfully than anyone except those felons not released on parole.

Probationers are close to the other end of the harmfulness scale. The most typical use of probation is as an alternative to jail for minor offenders, most commonly misdemeanants.... Unlike parolees, who were sent to prison for substantial terms, probationers attain that status from a judicial determination that their conduct and records do not suggest so much harmfulness or danger that substantial imprisonment is justified.

... Constitutional limits on supervision of probationers may be more extensive than those limiting supervision of parolees.

*Id.* at 1077 (footnotes omitted).

"A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Griffin,* 483 U.S. at 873, 107 S.Ct. 3164. In *Griffin,* for the warrantless search of the home of a convicted felon on probation for three misdemeanors, by regulation, "reasonable grounds" of criminal activity were *required.* 483 U.S. at 870–71, 107 S.Ct. 3164. In *State v. Anderson,* for the warrantless search of a felony probationer's home, reasonable suspicion of criminal activity and a probation condition were *required.* 733 N.W.2d 128, 140 (Minn.2007). In *Knights,* for the warrantless search of the home of a misdemeanant probationer subject to a search condition, reasonable suspicion of criminal activity was *required.* 534 U.S. at 114, 121, 122 S.Ct. 587. A warrantless search of a misdemeanant's DNA deserves at least as much Fourth Amendment protection as a felony probationer's home or a misdemeanant probationer's home.

The court concludes that the conditions of Johnson's probation—in particular random urinalysis—significantly reduces his expectation of privacy. The privacy interest upon which random urinalysis intrudes concerns dignitary harms only for the term of Johnson's probation. *M.L.M.,* 813 N.W.2d at 48 (Meyer, J., dissenting). Before 1993, Minnesota's DNA database law applied to *convicted* predatory offenders;[7] the law then expanded to include a person *charged* with a predatory offense and convicted of *any offense arising out of the same set of circumstances;*[8] and the law expanded again in 1999 to include a person charged with a *qualifying felony* and convicted of any offense arising out of the same set of circumstances.[9] In 2005, the class of qualifying felonies was expanded to any felony.[10] While the inclusion of violent offenders, or even all felony offenders, in the DNA database may be justifiable, the inclusion of misdemeanants is less acceptable:

The two compelling justifications for establishing a forensic DNA database of sex offenders, violent felons, or all felons is that these individuals are likely to engage in repeated criminal activity, and their conviction of a serious crime forfeits certain rights of bodily integrity and privacy relative to the law enforcement system. With a more comprehensive database, however, especially one in which the entire population is included, neither of these justifications apply.

Mark A. Rothstein & Meghan K. Talbott, *The Expanding Use of DNA in Law En-*

---

**7.** *See* Minn.Stat. § 609.3461, subd. 1 (1992).

**8.** Act of May 20, 1993, ch. 326, art. 10, § 15, 1993 Minn. Laws 1974, 2096–97 (codified at Minn.Stat. § 609.3461, subd. 1(1) (1994)).

**9.** Act of May 25, 1999, ch. 216, art. 3, §§ 7, 9, 1999 Minn. Laws 1271, 1314–16 (codified at Minn.Stat. § 609.117, subd. 1(1) (2000)).

**10.** Act of June 2, 2005, ch. 136, art. 12, § 9, 2005 Minn. Laws 901, 1064–65 (codified at Minn.Stat. § 609.117, subd. 1(1) (2010)).

*forcement: What Role for Privacy?*, 34 J.L. Med. & Ethics 153, 155 (2006) (footnote omitted).

Of additional concern, the DNA collection statute here, compelling biological specimens from persons merely charged for certain crimes, impacts those not guilty of the charged crime, eroding a Minnesota citizen's right to have the State prove guilt beyond a reasonable doubt.[11] Indeed, jurors are instructed on the presumption of innocence as a caution "that they are not to infer that the defendant committed the criminal acts charged against him merely because he has been brought to trial." *State v. Rivers*, 206 Minn. 85, 93, 287 N.W. 790, 794 (1939); *cf. Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978) ("This Court has declared that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."). I would not "elevate a finding of probable cause to the level of a proper determination of guilt beyond a reasonable doubt." *United States v. Mitchell*, 681 F.Supp.2d 597, 606 (W.D.Pa.2009), *rev'd*, 652 F.3d 387 (3d Cir. 2011).

### C.

Finally, I analyze and balance the privacy interest at stake against the extent to which it promotes legitimate government interests.[12] The State argues that the governmental interests in collecting DNA samples from a person convicted of only a misdemeanor are the same as for collecting DNA samples from felony offenders: "exonerating the innocent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure for victims of unsolved crimes." *Bartylla*, 755 N.W.2d at 18. Yet the State has not substantiated those claimed interests, much less shown that the collection and indexing of DNA from a person convicted only of a misdemeanor serves those interests to the same extent as the collection and indexing of DNA from a person convicted of a felony. *Cf. Skinner*, 489 U.S. at 632, 109 S.Ct. 1402 ("Because the record indicates that blood and urine tests, taken together, are highly effective means of ascertaining on-the-job impairment and of deterring the use of drugs by railroad employees, we believe the Court of Appeals erred in concluding that the postaccident testing regulations are not reasonably related to the Government objectives that support them.").

In fact, data on the effectiveness of DNA indexing appears to be weak. *See* Frederick R. Bieber, *Turning Base Hits into Earned Runs: Improving the Effectiveness of Forensic DNA Data Bank Programs*, 34 J.L. Med. & Ethics 222, 222 (2006) ("Data compilations on meaningful metrics of success are critically lacking."); Rothstein & Talbott, *supra*, at 154 ("[T]here is virtually no scientific, comprehensive, independent, peer-reviewed analysis quantifying the overall effectiveness of DNA databases in solving or preventing crimes.").

Our decision in *Bartylla* is not controlling on the question of the government's interest in this case. *Bartylla* involved a felony conviction. 755 N.W.2d at 17. We

---

11. The reasonable-doubt standard has constitutional stature. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

12. I want to emphasize again my belief that we have taken a wrong turn in our jurisprudence by balancing away two fundamental protections of the Fourth Amendment—the warrant and probable cause.

did not need to engage in a comprehensive examination of the privacy interests. The fact that the only privacy interest we discussed was the interest against physical intrusion shows that we were not engaging in a thorough analysis of the issue. *See id.* at 17–18. *Bartylla* merely shows that we have found that a felony offender's privacy interest against physical intrusion for the purpose of collecting a DNA sample for identification is less than the governmental interest in collecting a felony offender's DNA profile for indexing in a government database. *See id.* at 12 n. 2, 18. It says nothing about whether a misdemeanant's privacy interest in his DNA is less than the government's *incremental* interest in adding misdemeanant DNA to an existing database.

Furthermore, it is a dangerous oversimplification to say that the governmental interest in taking a DNA sample is the same whether the sample comes from a person convicted of a felony or a person merely convicted of a misdemeanor. The question is not whether having DNA in the database helps the government compare DNA left at crime scenes with the DNA profiles in the database, it is whether that DNA is likely to turn up a match. A DNA profile added to the database, but which never generates a match, actually reduces the effectiveness of the database because it increases the cost of maintaining and searching the database. We permit felony-level searches in part because we believe that felony offenders are likely to reoffend and that inclusion of their DNA profiles in the database will therefore populate the database with profiles from the people most likely to generate positive search results. The majority's reasoning—that the government has the same interest in indexing misdemeanant DNA profiles as felony offender DNA profiles—is disturbing because it is only a short step from there to the conclusion that the gov-ernment has a compelling interest in collecting *everyone's* DNA.

In concluding that felons on probation have a diminished expectation of privacy, courts have found that the government's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may … justifiably focus on probationers in a way that it does not on the ordinary citizen." *United States v. Sczubelek,* 402 F.3d 175, 184 (3d Cir.2005) (quoting *Knights,* 534 U.S. at 121, 122 S.Ct. 587) (internal quotation marks omitted); *see Bartylla,* 755 N.W.2d at 18. But the "government's interest in identifying misdemeanants is not as compelling as its interest in identifying convicted felons." *State v. McKinney,* 273 Neb. 346, 730 N.W.2d 74, 86 (2007) (holding that government interest in taking DNA from person convicted of misdemeanor forgery "without individualized probable cause" did not outweigh misdemeanant's privacy interest). A person convicted only of a misdemeanor has essentially the same expectation of privacy in the inherently personal information contained in his or her DNA as the ordinary citizen. The need to protect this information is made more compelling "when considering that Fourth Amendment protections once lost, are likely lost forever." *United States v. Mitchell,* 681 F.Supp.2d 597, 607 (W.D.Pa.2009) (quoting *United States v. Stewart,* 468 F.Supp.2d 261, 279 (D.Mass.2007)), *rev'd,* 652 F.3d 387 (3d Cir. 2011); *see also Kincade,* 379 F.3d at 837 (plurality opinion) ("[O]nce a person is convicted of one of the felonies included as predicate offenses under [the DNA Act], his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from blood sampling." (quoting *Rise v. Oregon,* 59 F.3d 1556, 1560 (9th Cir.1995) (internal quotation

**26**

marks omitted))). I would conclude that the balance between the high expectation of privacy the ordinary citizen has in his or her DNA, and the complete lack of evidence that the State's interests are served by searching a person convicted only of a misdemeanor, weighs decisively in favor of the conclusion that the search in this case violated the protections of the Fourth Amendment. I would therefore hold that the DNA collection statute, as applied to Johnson, is unconstitutional beyond a reasonable doubt.[13]

PAGE, J. (dissenting).

I join in the dissent of Justice Meyer.

ANDERSON, PAUL H. (dissenting).

I join in the dissent of Justice Meyer.

---

13. Because I would hold that Minn.Stat. § 609.117, subd. 1(1), is unconstitutional under the Fourth Amendment as applied to Johnson, I would not reach Johnson's equal-protection argument.